## UNITED STATES of America

v.

## Kelvin HARRINGTON, Defendant.

### Crim. No. 89–0138–01–LFO.

United States District Court, District of Columbia.

July 13, 1990.

ber 14, 1989, the Court imposed a guideline sentence of 97 months incarceration, but vacated that sentence a few hours later that day. *See* Transcript of September 14, 1989 ("Sept. Tr.") (filed Sept. 21, 1989) at 1. On the same day, the Court also vacated a sentence of 108 months incarceration imposed on September 11, 1989, on DeWayne Shorter and deferred sentencing of Kevin D. Jameson, both of whom had been convicted of drug offenses. On June 27, 1990, the Court sentenced Harrington to the mandatory minimum term of 60 months imprisonment pursuant to 21 U.S.C. § 841(b), with an additional four year term of supervised parole. Judgment Including Sentence Under the Sentencing Reform Act (filed June 29, 1990). On June 27, 1990, the Court also sentenced DeWayne Shorter to a sentence within the guideline range, stating considerations that distinguished Harrington's case from Shorter's and indicating that they would be the subject of a memorandum to be filed. Transcript of June 27, 1990 ("June Tr."). This is that memorandum with respect to defendant Harrington, which, pursuant to 18 U.S.C. § 3553(c)(2), sets forth the specific reasons for the June 27, 1990 imposition of a sentence outside the guidelines range.

I.

A.

Mark Ehlers, Asst. U.S. Atty., Thomas J. Gruscinski, Asst. U.S. Atty., Washington, D.C., for U.S.

Christopher W. Hall, Washington, D.C., for defendant.

## STATEMENT OF REASONS FOR DEPARTURE FROM THE SENTENCING GUIDELINES

OBERDORFER, District Judge.

On June 29, 1989, a jury found Kelvin Harrington guilty of distribution of cocaine base and possession with intent to distribute cocaine and cocaine base. On Septem-

Kelvin Harrington is a 30–year–old drug addict who has been using drugs since he was 17 years old.[1] On April 6, 1989, he was arrested and charged with the offenses for which he was later found guilty. It was his first offense or arrest. Following arrest he was released to third party custody, subject to electronic monitoring. From May 10 to June 28, 1989, he participated in Operation Progress, a drug treatment program sponsored by the D.C. Department of Corrections. Clinton R. Boyd, Chief, Office of Rehabilitative Services, D.C. Department of Corrections, reported that:

---

1. Harrington began his drug use in 1977, used marijuana daily and cocaine every other day. He told the Probation Officer that his drug use

interfered with his ability to maintain employment and "'got out of hand'" in the past two years. Presentence Report (July 24, 1989) at 8.

Mr. Harrington's participation in Operation Progress was excellent. He attended and participated in both group and individual counselling sessions. He submitted the required number of urine specimens and all were returned negative for illicit drug usage.

On May 24, 1989, Mr. Harrington secured employment on his own initiative with Temporary Personnel Pool Services, located in Arlington, Virginia. He was a Pool Technician Helper and his salary was $5.00 per hour.

*Evaluation*

Mr. Harrington complied with the mandated [sic] of the Program. He was able to focus on his situation and was able to display a level of maturity while he was in the program.

He displayed a desire to become a productive member of society. With continued counselling and vocational training, he could advance to a correction where he would not return to illegal means to maintain himself economically.

*Recommendation*

Based on Mr. Harrington's successful participation while in Operation Progress and his willingness to comply with the rules and regulations, it is respectfully requested that insightful consideration be given to him during sentencing that is consisted [sic] with his present adjustments.

Letter from Clinton R. Boyd (February 9, 1990) at 2.

The probation officer who prepared Harrington's Presentence Report (without benefit of the Operation Progress report) found the mandatory minimum sentence prescribed by Congress to be 60 months and the guideline range to be 97 to 121 months; he recommended a sentence of 97 months followed by four years of supervised release on the condition that during release Harrington participate in drug treatment. Presentence Report at 12.[2]

In the proceeding on the morning of the 14th, Harrington's appointed counsel stated:

... I am disturbed, given the fact that [the Guidelines] called for an exposure of anywhere from 8 to 12 years, given that this is Mr. Harrington's first offenses [sic], and in reviewing the sentencing guidelines and the Commission's statements on them, it is clear that, unless the Court feels that it can depart for the lack of defendant's criminal history, that the Court would have to give a sentence in that range.

... The defendant did go to trial, but he insisted all along that he was innocent of both offenses, that he was not the person who did the sale on March 30th, nor did he possess the crack and the cocaine that was found in the kitchen in the house where he was present, along with two other individuals.

The defendant is as [sic] high school graduate, he did have something of a work history prior to his arrest in these cases, and while he was a drug user, the defendant maintains that he was never a seller.

... In any event, given all that, that is why we would ask the Court to consider whether or not it could depart from the guidelines and go downward ...

Sept. Tr. at 2–3.

Harrington then addressed the Court, repeating counsel's request for a downward departure from the Guidelines and further stating:

I never possessed anything and I feel that, as far as me being a drug addict, this isn't the way that a problem should be handled. I need help, not incarceration, and it has taken me this to get help. .... [R]ight now it is a bad time as far as ... being involved in any type of drug thing, but I am not a dealer that possessed all of these so-called thousands of dollars and all of these grams of cocaine.

Sept. Tr. at 4. The Court expressed concern that the Sentencing Commission may not have given "adequate consideration to the possibility or probability that a [first offender drug addict who] is susceptible to treatment and rehabilitation [could] be restored to the community in a way that

---

**2.** The Presentence Report did not anticipate drug treatment during incarceration.

somebody who serves 9 years might not be." Sept. Tr. at 13–14. The Court nevertheless imposed a sentence of 97 months plus four years supervised release on the condition, among others, that "upon release," Harrington participate in a drug program. Sept. Tr. at 6–7. Upon completion of the morning sentencing process the Court requested that Harrington be retained in the area "for the period required by ... counsel to prepare an application for reduction of sentence, so that you can cooperate with them in doing that." Sept. Tr. at 7.

█ Harrington's case was one of a series of sentencing hearings of drug addict defendants in a brief time span in which the Sentencing Guidelines appeared to the Court to require sentences substantially greater than the very substantial minimum sentences mandated by Congress. Increasingly concerned as to whether the Sentencing Guidelines did, or could validly, mandate such sentences in first offender drug addict cases where the potential for successful drug treatment was high, and recognizing how difficult it was for court-appointed lawyers, or the Court itself, adequately to evaluate the relevant jurisprudence and literature, the Court appointed Bruce Baird, Esq., a former Assistant United States Attorney in the Southern District of New York and now a member of the firm of Covington and Burling, as *amicus curiae* to address the question of whether such sentences were required by law. For these reasons, later on the same day, the Court vacated Harrington's 97 month guideline sentence with a view to imposing

sentence after receipt of the advice of *amicus.* *See* Fed.R.Crim.P. 32(a)(1).[3]

## B.

On November 1, 1989, *amicus* filed a comprehensive memorandum which collected relevant precedents and scientific literature on drug abuse. *Amicus* concluded that although the Sentencing Guidelines are facially constitutional and do not impermissibly intrude on, *inter alia,* the due process rights of litigants, the Guidelines pass due process muster in part because sentencing judges are permitted to depart from the Guidelines in appropriate cases. Memorandum of Law of Amicus Curiae on Sentencing Guidelines Issues (Nov. 1, 1989) ("Amicus Memorandum") at 18. *Amicus* noted that important mitigating factors not considered in the Guidelines constituted grounds for departure as stated explicitly in both the statutes and the Guidelines:

> The purposes of the United States Sentencing Commission [include] ... maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of [the Guidelines].

28 U.S.C. § 991(b)(1)(B). Specifically, *amicus* noted that the authorizing statute allows a court to depart if it finds:

> that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

**3.** At the September 14, 1989, hearing, the government indicated some doubt as to the Court's authority to vacate the sentence imposed earlier that day. Sept. Tr. at 13. In point of fact the Court reluctantly imposed sentence on September 14 at about 9:30 A.M. and invited counsel to move for reconsideration. Sept. Tr. at 7. The hearing resumed at 2:00 P.M. at which time the Court vacated the sentence with a view to appointing *amicus curiae.* The defendant did not leave the courthouse until after the afternoon hearing, which he attended.

It is well established in this circuit that a district court may modify a sentence until the time at which the defendant begins to serve it. "It has never been doubted that a district court

retains the power to recall the defendant and increase the severity of the sentence at any time before he begins to serve the sentence and *a fortiori* before he leaves the courthouse." *United States v. Jordan,* 810 F.2d 262, 266 n. 1 (D.C. Cir.1987); *see also United States v. Fogel,* 829 F.2d 77, 84 (D.C.Cir.1987); *United States v. Davidson,* 597 F.2d 230 (10th Cir.1979); *Walton v. United States,* 202 F.2d 18, 19–20 (D.C.Cir. 1953); *Miller v. Snook,* 15 F.2d 68, 69 (N.D.Ga. 1926). The same principles which establish that the sentencing process continues while a defendant is still in the courthouse so as to permit an increase in its severity apply with equal force to permit vacation of a sentence while the defendant is still in the courthouse.

18 U.S.C. § 3553(b) (Supp. V 1987). *Amicus* also pointed out that Sentencing Guideline § 5K2.0 has implemented this congressional authorization for departure by a sentencing court:

> Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing.... Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. The presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing judge. Similarly, the court may depart from the guidelines, even though the reason for departure is limited elsewhere in the guidelines (*e.g.*, as an adjustment or specific offense characteristic), if the court determines that, in light of the unusual circumstances, the guideline level attached to that factor is inadequate.

Guideline § 5K2.0. *See also* Guideline 5H1.3. Distinguishing between addiction, which may not be considered in sentencing pursuant to Guideline § 5H1.4 ¶ 2, and the likelihood of rehabilitation from drug addiction, *amicus* concluded that the likelihood of successful treatment of addiction was a factor not considered in the Guidelines and therefore was a basis for departure. *Id.* at 30. After canvassing the literature on the effectiveness of drug treatment on drug use and criminal behavior, *amicus* found that "despite doubts regarding the efficacy of drug treatment programs in the mid–70s ..., recent research reveals that such treatment can be effective, in terms of reducing both drug use and criminal behavior." *Id.* at 31.

*Amicus* also determined that while amenability to successful drug treatment cannot be measured prior to an individual's entering a drug treatment program, *id.* at 34, there is a correlation between successful drug treatment and an individual's initial and ongoing behavior and responses while in a drug treatment program. *Id.* at 34–35. In addition, *amicus* observed that certain psychiatric characteristics have been negatively correlated with successful drug treatment, such as antisocial personality disorder, avoidance, dependance, and paranoia and that psychiatric testing could be useful to a court in determining the likelihood of rehabilitation. *Id.* at 37–39. *Amicus* suggested that the likelihood of successful treatment could be determined both from objective factors including those listed in the Presentence Reports and by expert psychiatric testing. *Id.* at 39.

## C.

The government, responding to *amicus*, argued that since "rehabilitation has been rejected as a goal in sentencing" and drug dependence is not a basis for departure under Guideline § 5H1.4, the court could not depart in this instance. Government's Memorandum in Aid of Sentencing ("Government Memorandum") (December 20, 1989) at 9. The government further argued that while the Sentencing Guidelines do not eliminate the court's discretion, "[d]epartures should be granted only in atypical cases where a defendant's conduct differs significantly from the norm." *Id.* at 8. Finally, the government contended (without citation of authority) that "successful" drug treatment has "never been defined[4] and, in the actual field of substance abuse treatment programs, does not exist [sic]."[5] *Id.* at 11. According to the

---

4. *Amicus* noted, however, that a candidate for successful drug treatment was defined in the Narcotic Addicts Rehabilitation Act of 1966 as "an addict 'likely to be rehabilitated through treatment.'" 18 U.S.C. §§ 4252–53 (repealed as part of blanket repealer of pre–1987 sentencing statutes). Pub.L. 98–473, 98th Cong., 2d Sess. (1984).

5. *But compare Understanding Drug Treatment*, An Office of National Drug Control Policy White Paper (June 1990) stating:

> We now know on the basis of more than two decades of research that drug treatment can work.

*Id.* at 30, and further stating:

government, drug addiction is a "disease that subjects the addict to potential relapse *at any time*.... Even total abstinence cannot be termed successful since the addict always carries the disease...." *Id.* at 12. (Emphasis in original). The government concluded that "[i]t therefore seems counterproductive to further expend government resources in an attempt to determine adequate drug treatment for these defendants at this time." *Id.*

## D.

On January 25, 1990, when the Court confronted major surgery and a long convalescence, Magistrate Patrick Attridge accepted responsibility for carrying on administration of this matter and making a recommendation to the Court as to whether a sentencing judge may depart from the Guidelines sentence range where drug treatment of an addict defendant appears likely to succeed and, if so, whether these particular defendants should be the subject of such a departure. Magistrate Attridge arranged for Harrington (and Shorter) to be examined by Dr. Joseph Chambers, a psychiatrist specializing in alcoholism and drug abuse, and his associate Donald Streater who would then provide the Court with expert opinions. On June 4, 1990, the government and the several defendants stipulated that the reports of Dr. Chambers and Mr. Streater represented the record in place of testimony at a hearing before Magistrate Attridge and that Dr. Chambers and Mr. Streater were "experts in the field of addiction to controlled substances and qualified to give expert opinions on whether Kelvin Harrington was such an addict when he was arrested ... and what his present chances are for successful rehabilitation." Stipulation (June 1, 1990).

Dr. Chambers interviewed Harrington on April 2 and April 21, 1990. The April 2 interview was at the D.C. Jail. Harrington had been participating since March 1 in the Unfoldment Substance Abuse Treatment Program sponsored at Lorton by Twelve

---

Drug treatment may be deemed successful when, three to five years after treatment, a former addict is no longer using drugs.

John Does and the D.C. Department of Corrections. At this first interview, Dr. Chambers found Harrington to be "compliant, cooperative and polite," but upset at being taken away from "his intense drug rehabilitation program at Lorton which is clearly quite important to him." Letter of Dr. Joseph F. Chambers to Christopher W. Hall ("Chambers Letter") (April 24, 1990) at 1.

At the April 21 interview, conducted at Lorton, Dr. Chambers found Harrington, a high school graduate and former football star, to be "bright, self-centered, capable and assertive." *Id.* The doctor observed him to be "tall, handsome, and in excellent physical shape." *Id.* Dr. Chambers was impressed by Harrington's vigorous pursuit of admission into the Unfoldment Program. Dr. Chambers found that Harrington had been enrolled in the program for seven weeks and was an active participant. With respect to the program, Dr. Chambers observed:

> This is a 48–week, 15 hour/day intense program which emphasizes personal responsibility, self discipline and orderly living. It is based on the "12 step" philosophy of living. *Its intensiveness and discipline equals any program I have seen.* It is possible for him to repeat this 48–week program.

*Id.* (Emphasis added.)

From the interviews and the Presentence Report which had been made available to him, Dr. Chambers concluded:

> He was open, and seemed honest and willing. More importantly, if he can become concerned about others, and if he can continue his current intense commitment to the treatment throughout his incarceration, and possible parole, the long term prognosis is quite favorable. Most men who do accept this way of life do succeed.

*Id.* at 2.

## E.

Dr. Chambers report is strongly corroborated by the recently released Office of

---

*Id.* at 22.

National Drug Control Policy White Paper entitled *Understanding Drug Treatment,* June 1990, issued by William J. Bennett, Director, Office of National Drug Control Policy ("White Paper"), a document not in existence and therefore not considered by the Sentencing Commission or the Magistrate when they formed their respective opinions.

> The White Paper states unequivocally: We now know on the basis of more than two decades of research that drug treatment can work.

*Id.* at 30. The White Paper recognized that:

> [A]ddicts never emerge from a treatment program completely "cured." In fact it is only after they leave the relatively protected environment of a treatment program that they face the greatest challenges to their efforts to stay off drugs.

*Id.* at 21. However, the White Paper emphasized with respect to drug treatment for prison inmates:

> ... Most convicts who were once heavily involved with drugs finish their prison terms without having any drug treatment[6], and many return to a life of drugs and crime upon release.
>
> Of course, prisons are designed to incapacitate criminal offenders and provide just punishment. But prisons can also provide a useful setting for drug treatment: drugs are harder to come by inside a prison; drug testing and accountability are usually not new to correctional facilities; and inmates preparing for release are sometimes eager to find a way out of the type of behavior that put them in prison in the first place.

*Id.* at 28. In language strikingly paralleling that of Dr. Chambers, the White Paper observed:

> The ethos of personal accountability and adherence to rules that pervades the criminal justice system is frequently a part of effective drug treatment. Good treatment programs insist on a code of

conduct, individual responsibility, personal sacrifice, and sanctions for misbehavior. There is now an impressive amount of evidence to suggest that when drug treatment contains these elements, we get results: addicts change their self-destructive pattern of behavior and stop or dramatically reduce drug use. That's why drug treatment and criminal justice must be understood as allies in our fight against drug use.

*Id.* at 1–2.

## II.

### A.

After receiving the psychiatrist's opinions, but without benefit of the White Paper, Magistrate Attridge filed a careful report, recommending that the Court sentence all three defendants within the guidelines ranges. Report and Recommendation (June 21, 1990). Magistrate Attridge based his legal recommendations on Congress' rejection of the theory that imprisonment should promote rehabilitation, drawing on *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 650–51, 102 L.Ed.2d 714 (1989) and its discussion of the legislative history reported in Senate Report No. 98–225 (1983), *reprinted in* U.S.Code Cong. & Admin.News 1984 p. 3182. In addition, he cited Guideline 5H1.4's specific statement that drug dependency does not justify downward departure from the Guidelines. *Id.* at 10–11 & n. 15. On these grounds, the Magistrate concluded that the possibility of rehabilitation was considered and rejected by both the Sentencing Commission and Congress. Report and Recommendation at 11. In addition, the Magistrate found Dr. Chamber's and Mr. Streater's reports on Harrington's potential for drug rehabilitation to be "equivocal factually." *Id.* at 14.

### B.

The Magistrate seems to have concluded that departure from the Guidelines with

---

**6.** Harrington's Presentence Report seemed to have contemplated that in the usual case there would be no drug treatment until after eight years imprisonment, the treatment to begin only during supervised release. In this case Harrington has already participated in Operation Progress and the Unfoldment Program.

respect to an addict who is likely to succeed in drug treatment is impermissible because Congress rejected rehabilitation as a goal of sentencing. In fact, however, Congress did not foreclose consideration of the likelihood of successful drug treatment as a factor to be considered in sentencing a first offender addict. As *amicus*, the Magistrate, and the government have observed, Congress, in implementing the Sentencing Reform Act of 1984, did "reject[ ] imprisonment *as a means* of promoting rehabilitation." *See Mistretta*, 109 S.Ct. at 652, citing 28 U.S.C. § 994(k) (emphasis added). However, imprisonment imposed for the purpose of rehabilitation is distinguishable from the possibility of rehabilitation as an appropriate factor in determining the length of a sentence. Congress, discussing the purposes of the Sentencing Reform Act of 1984, 18 U.S.C. 3551 *et seq.*, specifically acknowledged this distinction:

> The fourth purpose is to provide rehabilitation. During the hearings concerning the revision of the Federal Criminal Code, arguments were advanced that rehabilitation should be eliminated completely as a purpose of sentencing. The Committee has rejected this view. Instead, the Committee has retained rehabilitation and corrections as an appropriate purpose of a sentence, while recognizing, in light of current knowledge, that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

Senate Committee on the Judiciary, S.Rep. No. 98–225, 98th Cong. 2d Sess. (1983) at 76, *reprinted in* U.S.Code Cong. & Admin. News 1984, 3182, 3259–60 (citations omitted), derived from S. 1762, 98th Cong., 2d Sess. (1984).[7]

The Senate Report plainly stated:

> The Committee does not suggest that efforts to rehabilitate prisoners should be abandoned,

and further stated that:

> [t]he purpose of rehabilitation is still important in determining whether a sanc-

tion other than a term of imprisonment is appropriate in a particular case. *Id.* at 3259, 3260.

### C.

■ Since Congress did not foreclose consideration of a defendant's prospect of rehabilitation as a factor to be considered in determining the duration of a prison sentence, the question remains whether the Commission considered the prospect that a defendant was a likely prospect for successful drug treatment so as to preclude departure from the Guidelines based on that factor. However, on oral argument about one of the related sentences, *amicus* advised the court that, employing the vast resources of Covington & Burling, he had found no direct evidence of Sentencing Commission consideration of amenability to successful drug treatment as a factor in sentencing. Nor has the Court. Examination of the four corners of the Guidelines and official comment on them provides no indication that the Commission addressed the case of a first offender drug addict found by expert opinion to be a likely candidate for successful treatment for drug addiction. *See United States v. Pipich*, 688 F.Supp. 191, 193 (D.Md.1988) ("sources to be consulted by the Court [in determining whether a circumstance was adequately taken into consideration by the Commission under Section 3553(b) ] are *only* the Guidelines, the Commission's policy statements, and its official commentary.") (Emphasis in original.)

Neither does the Sentencing Commission's rejection of addiction as a factor to be considered in sentencing, Sentencing Guideline § 5H1.4 ¶ 2, establish that the Sentencing Commission considered the likelihood of successful treatment for addiction. Section 5H1.4 ¶ 2 states: "Drug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines. Substance abuse is highly correlated to an increased propensity to commit crime." There is an obvious negative preg-

7. S. 1762, a proposed Comprehensive Crime Control Act of 1984 passed by the Senate on February 2, 1984, contains the same language under its section 3553(a)(2) as the final version of the Act. 130 Cong.Rec. Part 2 at 1592 (1984).

nant in this statement by the Commission: successful treatment for drug abuse could lead to a reduced propensity to commit crime and thereby reduce the need for the longer periods of incarceration contemplated by the Guidelines with respect to drug law violations. The Sentencing Commission's rejection of addiction as a sentencing factor is no indication of its consideration of susceptibility to successful treatment for drug addiction, rather, the negative pregnant tends to confirm the opposite reading of the Guidelines and the official comments.

Other courts have made similar findings that a successful effort to overcome an addiction is a mitigating factor not considered by the Sentencing Commission. In *United States v. Maddalena*, 893 F.2d 815, 817 (6th Cir.1989), the court reversed a district court determination that it did not have authority to depart from the Guidelines due to the mitigating circumstance of defendant's attempts to free himself from drug use, stating: "we remand this case to the District Court, instructing the judge that he may, but need not consider the defendant's efforts to stay away from drugs as a basis for departing from the guidelines." *Id.* at 818. The court in *United States v. Rodriguez*, 724 F.Supp. 1118, 1119 (S.D.N.Y.1989) (Leval, J.), departed downwards from the guidelines range because the defendant "accomplished an impressive rehabilitation," noting that "[t]he rehabilitation of a drug addict by his act of will is no mean accomplishment." [8]

Courts have also stated that sentencing courts have substantial discretion in deciding to depart based on mitigating circumstances not considered in the Guidelines under 18 U.S.C. 3553(b) and Guideline 5K2.-0. *See United States v. Roberson*, 872 F.2d 597, 603 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989) ("The court's discretion to depart from the Guidelines is broad."); *United States v. Correa–Vargas*, 860 F.2d 35, 37 (2d Cir.1988) (Section 5K2.0 "gives a district court wide discretion in determining which circumstances to take into account in departing from the Guidelines."); *United States v. Sturgis*, 869 F.2d 54, 57 (2d Cir. 1989) ("In *Correa–Vargas* we emphasized the 'wide discretion' accorded district court judges ...").

■ Furthermore, this Circuit has recently upheld an upward departure from the Guidelines on three separate grounds not considered by the Sentencing Commission. *United States v. Burns*, 893 F.2d 1343 (D.C.Cir.1990) *cert. granted*, —— U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (June 26, 1990). The court held on appeal that the Commission did not consider disruption of a government function, duration of the crime, or commission of one offense to conceal the commission of another offense, and that each of these factors warranted departure under 18 U.S.C. § 3553(b). The principle authorizing departure in *Burns* applies with equal force in the circumstances here. Thus, the Guidelines and the official comment, including the Commission's rejection of addiction as a factor in sentencing, provide no evidence of consideration of a first offender drug addict's probable success in drug treatment as a factor in sentencing and the absence of consideration of this mitigating factor constitutes a basis for departure where expert opinion and other evidence leads to a finding that successful treatment for drug addiction is likely.

### III.

■ The question remains therefore whether, since departure is permitted because of the likelihood of successful treatment, there should be a departure in this particular case. The preponderance of the evidence including the uncontroverted ex-

---

**8.** *See also United States v. Concepcion*, 721 F.Supp. 493, 497–98 (S.D.N.Y.1989) (downward departure under Section 3553(b) warranted in part due to defendant's post-incarceration efforts to reenter society); *United States v. Kopp*, 1 Fed.Sent.R. 123, (D.N.D. Apr. 29, 1988) (downward departure granted for youthful first offender); *United States v. Haigler*, 1 Fed.Sent.R. 34, 37 (D.Minn. May 19, 1988) (special circumstances warranting downward departure from 97 to 84 months include substantial family ties and potential for drug free future with productive employment).

pert opinion establishes that successful treatment of Harrington's addiction is likely and that future criminal activity by him is unlikely. Kelvin Harrington had been using drugs since he was 17 years old and was an addict when he became involved for the first time in the criminal justice system. In the opinion of Dr. Chambers, "if he can continue his current intense commitment to the treatment throughout his incarceration, and possible parole, the long term prognosis is quite favorable. Most men who do accept this way of life do succeed." Letter of Dr. Joseph F. Chambers to Christopher W. Hall (April 24, 1990) at 2. Harrington's ability to meet the conditions in Dr. Chambers' opinion is evidenced by his successful participation in Operation Progress which was described as "excellent." He was also described as "able to focus" and "to display a level of maturity." Letter from Clinton Boyd (February 9, 1990). He secured and maintained employment while enrolled in Operation Progress. A letter from J. Britt, Senior Correctional Officer at Lorton dated December 14, 1989, states: "I believe Resident Harrington['s] diligence and dedication has enabled him to be viewed as a positive role model to other residents in his housing unit." A letter from Jerome Jordan, Substance Abuse Counselor in the Unfoldment Program in which Harrington is currently enrolled, dated May 24, 1990, states that "Mr. Harrington has shown remarkable growth and continues to build his self-esteem." Dr. Chambers described Harrington as "open," "honest," and "willing." At the sentencing hearing on June 27, Harrington's appointed counsel stated that the directors of the Unfoldment Program had offered Harrington the opportunity to participate in a second 48 week program where he could train as a counselor and Harrington expressed his interest in becoming a counselor in the program during a second session. June Tr. at 7.

The White Paper tangentially confirmed the promise of such a program for an inmate like Harrington, finding that therapeutic communities having characteristics similar to those attributed by Dr. Chambers to Lorton's Unfoldment Program, have a:

> good record of success, with as many as 4 out of 5 patients who complete the program drug free several years out of treatment.

*Id.* at 15. At the sentencing hearing on June 27, 1990, defense counsel reported that Harrington had recently received a certificate for completing the first three months of the Unfoldment program, that only 49 of 60 participants did complete the first three months, and that "[t]hose are the hardest three months of the program." June Tr. at 4. The evidence of Harrington's successful participation in two programs to date and his future commitment to drug treatment is not traversed by any government expert or other information on the record. The entire record, together with the written and oral reports of the Probation Officer to the Court and its observations of Harrington on his several court appearances before and during the jury trial and during the sentencing proceedings further reinforce the expert's conclusion and the strong indicators that Harrington is likely to meet the conditions attached to that conclusion.

Drug addiction and drug trafficking are national calamities. A jury has found Harrington guilty of serious drug offenses. At the same time he is an addict who has demonstrated that he is amenable to successful drug treatment in prison which is likely to curb any criminal propensities. The Sentencing Reform Act of 1984[9] requires that he be punished by a substantial

---

9.     (a) ... The court, in determining the particular sentence to be imposed, shall consider—
   ....
   (2) the need for the sentence imposed—
   (A) ... to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with ... correctional treatment in the most effective manner.
18 U.S.C. § 3553(a)(2).

sentence which will incapacitate him and deter others susceptible to deterrence. The Act also, however, requires that the sentence provide correction by encouraging Harrington's so far successful and promising effort to curb his addiction and materially diminish any propensity for crime.

The White Paper found that:

Research indicates that those who spend more than three months in a [therapeutic community]—even without completing the program—reduce drug use and criminal behavior.

*Id.* at 15. As Judge Leval put it:

[The Sentencing Reform Act] unquestionably envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes.

*Rodriguez*, 724 F.Supp. at 1120. These considerations apply to Harrington.

Accordingly, on June 27, 1990, the Court imposed a substantial sentence of five years incarceration plus four years supervised release, with a request to the government that it continue Harrington's access to the in prison drug treatment program which Dr. Chambers found to be so promising.