UNITED STATES of America, Appellee,

v.

Curtis COPELAND,
Defendant–Appellant.

No. 915, Docket 89–1495.

United States Court of Appeals,
Second Circuit.

Argued March 12, 1990.

Decided April 23, 1990.

David N. Kelley, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the S.D.N.Y., Kerri Martin Bartlett, Asst. U.S. Atty., on the brief), for appellee.

Bobbi C. Sternheim, New York City, for defendant-appellant.

Before KEARSE, CARDAMONE, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Curtis Copeland appeals from a judgment of the United States District Court for the Southern District of New York convicting him, following his plea of guilty before Robert J. Ward, *Judge*, of attempt to distribute cocaine and cocaine base in a form commonly known as "crack," in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 846 (1988), and 18 U.S.C. § 2 (1988). Copeland was sen-

tenced principally to a prison term of 12 months. On appeal, he contends that his offense level was improperly calculated with reference to quantities of cocaine that were not involved in the transaction at issue. We disagree and affirm the judgment.

## BACKGROUND

The events are apparently not in dispute. On April 26, 1989, an undercover agent approached Copeland in the men's restroom of a theatre and asked him if he was selling crack. Copeland instructed the agent to follow him; he led the agent to the balcony area of the theatre and directed the officer to seats in the rear where codefendants Darrell Whaley and Jerome Jackson were sitting. Copeland told the agent to sit down and told Whaley and Jackson that the agent was "looking" to buy crack. Jackson admonished Copeland, "How many times have I told you not to bring anyone up here." Jackson then accepted $15 from the agent and handed it to Whaley; Whaley handed three vials of crack to the agent. The transaction was rescinded, however, when Jackson insisted that the agent smoke at least one of the vials of crack in his presence, and the agent refused. Copeland escorted the agent out of the balcony area and chided him for his refusal to accede to Jackson's demand.

Shortly thereafter, other agents arrived and arrested Jackson and Whaley in the balcony area. Jackson had in his possession three vials of crack. Whaley had in his possession $360; under a seat nearby, the agents found approximately 63 vials of cocaine. All 66 vials, clear with pink tops, were identical in appearance to the vials of crack handed to the undercover agent in the aborted transaction.

The agents arrested Copeland in the lower level of the theatre. Following his arrest, Copeland admitted having taken the undercover agent to the balcony to purchase crack. He said he had hoped that by participating in the transaction, he would receive either a tip or a share of the crack purchased. He had in his possession a glass pipe-like device typically used to smoke crack.

Copeland, Whaley, and Jackson were indicted on a charge of distributing three vials of crack; Whaley and Jackson were charged with possessing 63 vials of crack with intent to distribute; Jackson alone was charged with possessing three vials of crack with intent to distribute. Copeland entered into a formal cooperation agreement with the government and pleaded guilty to a superseding information charging him with attempted distribution of the three vials of crack. In his plea allocution, Copeland described the above events and stated that he knew Whaley and Jackson from his prior dealings with them and knew the substance being sold was crack.

Thereafter, in preparation for sentencing, the probation department calculated that Copeland's imprisonment range under the federal Sentencing Guidelines ("Guidelines") was 51–63 months. This was based not only on the three vials involved in the aborted transaction but also on the 63 vials of cocaine recovered during the arrests of Jackson and Whaley. Copeland objected to the inclusion of the 63 vials. In response, the government urged the court to consider the 63 vials relevant but to depart downward from the prescribed Guidelines range in light of Copeland's cooperation and his role as a minor participant.

At the start of the sentencing hearing, the district court offered Copeland the opportunity to withdraw his plea of guilty. Copeland declined. Following argument with respect to the disputed presentence report matters, the district court made findings as follows:

I perceive Mr. Copeland to have acted as a steerer operating, shall we say, on a commission basis; that is he would receive drugs, to the extent he was of assistance to the other two defendants, who I clearly regard as more culpable.

As such, I suggest that if during the course of the day he had succeeded in steering additional customers to his codefendants, and they would have sold those customers from their inventory, he

would have received additional benefits in the way of drugs.

Under this analysis, although he was not charged with responsibility for more than three vials, I suggest his relevant conduct, as, what I will characterize as a steerer, working on what I characterized as a commission basis, would have made him legally responsible for the entire inventory.

. . . .

... I find that Mr. Copeland's relevant conduct results in his being responsible for the entire 63 vials.

On this basis, and considering Copeland to be a minor participant, the court concluded that the appropriate imprisonment range under the Guidelines was 41–51 months. Taking into account, however, Copeland's cooperation with the government, the court sentenced him to a prison term of 12 months.

This appeal followed.

## DISCUSSION

On appeal, Copeland contends principally that, since he was not charged with either possessing the 63 vials of cocaine or conspiring with Jackson and Whaley, and since he pleaded guilty only to attempted distribution of three vials, the district court erred in ruling that the 63 vials were relevant to Copeland's criminal conduct. We disagree.

With respect to narcotics offenses, the Sentencing Guidelines establish base offense levels that vary with the quantity of narcotics involved. *See* Guidelines § 2D1.1. If a defendant is charged with two or more offenses that are closely related, such as those involving different quantities of narcotics, the offenses are grouped together for determination of his base offense level, *id.* § 3D1.2(d), and that level is determined by his "relevant conduct," *id.* § 1B1.2 commentary n. 2 ("[w]here there is more than one base offense level within a particular guideline, the determination of the applicable base offense level [ordinarily shall be based on] the 'relevant conduct' criteria of § 1B1.3").

Section 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)," requires the sentencing court, in determining a defendant's base offense level, to take into account certain conduct that is not part of the offense of which the defendant is convicted but that is of the type that would have been a factor in calculation of his offense level had he been convicted of that as well. It states that, unless otherwise specified,

> (i) the base offense level where the guideline specifies more than one base offense level ... shall be determined on the basis of the following:
>
> . . . .
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.

*Id.* § 1B1.3(a) (amended in nonmaterial respect effective Nov. 1, 1989). The background commentary to this section states that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." *Id.* § 1B1.3 commentary.

As we observed in *United States v. Fernandez*, 877 F.2d 1138 (2d Cir.1989), these provisions bespeak a preference for realistic, rather than formalistic, appraisal of a given defendant's offense. That is, the district judge is authorized to sentence a defendant "upon the facts of the actual offense (known as 'real offense' sentencing)" as opposed to merely "the offense for which he was charged and convicted (upon the 'charge offense,' ... )." *Id.* at 1141; *see also United States v. Guerrero*, 863 F.2d 245, 248 (2d Cir.1988). "[T]his 'real offense' approach keys the sentence to the real harm posed by the offense,...." *United States v. Fernandez*, 877 F.2d at 1142; *see also* Guidelines Ch. 1, Pt. A, n. 4(a); *accord United States v. Blanco*, 888 F.2d 907, 909 (1st Cir.1989) (Breyer, J.) (reference to "relevant conduct" in certain

cases "reflects a compromise that the Sentencing Commission made among considerations that favor a 'real offense' sentencing system and those that favor a 'charge offense' system").

Recognizing the preference for "real offense" sentencing in narcotics cases, and "giv[ing] due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e) (1988), we have upheld the district court's consideration of quantities of narcotics not involved in the count of conviction in a variety of circumstances. In *Fernandez*, we upheld an offense-level calculation based on the entire amount of cocaine seized from the defendant—25 kilograms—although he pleaded guilty to importation of only 500+ grams. *See* 877 F.2d at 1142. Similarly, in *United States v. Bedoya*, 878 F.2d 73, 76 (2d Cir. 1989) (per curiam), we upheld an offense-level calculation based on a total of 21 kilograms of cocaine seized from the defendant, his apartment, and a coconspirator who had just left the defendant's house, notwithstanding his plea of guilty to a superseding information charging him with possession, with intent to distribute, of only 500+ grams and his plea allocution admission to the possession, with intent to distribute, of only four kilograms. We rejected his contention that the government's withdrawal of its original charge that he had possessed more than five kilograms precluded the district court's consideration of the far larger amount seized as relevant for purposes of sentencing. In *United States v. Paulino*, 873 F.2d 23, 25 (2d Cir.1989) (per curiam), the coconspirators had agreed to sell undercover agents a total of two kilograms of cocaine. Some 64 grams were delivered in a transaction in which Paulino acted as a lookout and security guard; some 1,884 grams of cocaine and 41 grams of crack were later seized. Notwithstanding Paulino's "minimal knowledge of the scope of the transaction and . . . minimal control over its execution," we upheld the district court's conclusion that the entire two kilograms were relevant. *Id.* In *United States v. Guerrero*, 863 F.2d at 250, the defendant, aware of a proposed larger heroin transaction, relayed a small sample of heroin from a supplier to a supposed purchaser who was in fact a government informant. We ruled that the base offense-level calculation should take account of the entire quantity that was to have been involved in the proposed transaction, not just the smaller sample amount.

■ Though Copeland correctly notes that in most of these cases the defendant had initially been charged either with possession of the larger quantities of narcotics or with conspiracy, these cases do not circumscribe the sentencing court's authority. The Guidelines consider conduct relating to quantities of drugs not mentioned in the charge to be relevant for sentencing purposes, whether or not conspiratorial, if it was part of the same "course of conduct." Here the court found that Copeland had engaged in a course of conduct in which he served his codefendants as a steerer, a finding that must be upheld unless it was "clearly erroneous." 18 U.S.C. § 3742(e). We have defined a steerer as someone who "direct[s] buyers to sellers in circumstances in which the sellers attempt to conceal themselves from casual observation," *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989), and we have noted the importance of steerers to certain narcotics distribution operations. "Without 'steerers,' buyers would either find it difficult to locate sellers or sellers would have to risk exposure to public view." *Id.*

The district court's finding that Copeland served Jackson and Whaley in this capacity was properly supported by a preponderance of the evidence. *See United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). It is indisputable that Jackson and Whaley were conducting cocaine sales in the theatre. When arrested, they had in their actual or constructive possession 66 vials of cocaine. Copeland testified at his plea allocution that he was aware from his prior dealings with Jackson and Whaley that they were selling crack, and he admitted that he had escorted the undercover agent to the balcony to enable the agent to purchase crack from them.

Though Copeland argued that he was not an employee of Jackson and Whaley but hoped to receive a tip, either monetary or a portion of the crack purchased, from the purchaser, not the sellers, the provenance of the expected benefit was not material. The district court was entitled to reject the suggestion that Copeland did not play a material role in the Jackson–Whaley operation or that he would not benefit from the sale of their entire inventory. The record makes it plain that Copeland's steering of the undercover agent was not an isolated event. Copeland indicated that he had had several past dealings with Jackson and Whaley, and Jackson's comment when Copeland brought the agent to the balcony revealed that Copeland had brought potential customers to the balcony on a number of prior occasions.

The sentencing court was entitled to infer from all of these facts that Jackson and Whaley conducted their drug business in the theater in order to avoid exposure to public view, that without Copeland's assistance, Jackson and Whaley would have been less able to sell crack from their circumspect location, and that Copeland was prepared to steer as many customers as he could to purchase as much crack as Jackson and Whaley had for sale. We see no basis for overturning the finding that, if during the course of the day Copeland had succeeded in steering additional customers to Jackson and Whaley and they had sold to those customers from their inventory, Copeland would have received additional benefits. Accordingly, we conclude that the court did not abuse its discretion in construing the 63 vials to be relevant to the conduct for which Copeland was convicted.

 Finally, we reject Copeland's contention that, because the indictment and superseding information did not charge the 63 vials to him, consideration of that quantity of cocaine violated his right to due process. The Due Process Clause does not restrict the court with respect to the type of information it may consider for purposes of sentencing. *See, e.g., Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949); *United States*

*v. Alexander*, 860 F.2d 508, 512–13 (2d Cir.1988); *United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987). The defendant, of course, is entitled to notice of and an opportunity to respond to information to be considered by the sentencing court, in order that he not be sentenced on the basis of misinformation. *See, e.g., Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). Copeland was provided not only with opportunities to respond, but also with the opportunity to withdraw his plea of guilty. He was informed by the presentence report that the court would be asked to consider the 63 vials as relevant conduct in determining his base offense level for sentencing. Following receipt of Copeland's written objections to the court's consideration of that quantity, the court asked Copeland whether he wished to withdraw his plea. Copeland responded that he did not. We see in these proceedings no violation of his right to due process.

## CONCLUSION

We have considered all of Copeland's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.