UNITED STATES of America

v.

Tonya DAVIS, Defendant.

Crim. No. 90–0381–LFO.

United States District Court, District of Columbia.

April 24, 1991.

Stephanie G. Miller, J. Jiyoung Bang, Asst. U.S. Attys., Washington, D.C., for U.S.

Daniel E. Ellenbogen, Washington, D.C., for defendant.

## SENTENCING MEMORANDUM

OBERDORFER, District Judge.

On November 5, 1990, Tonya Davis pled guilty to one count of distributing a mixture or substance containing cocaine base, commonly known as "crack," in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C). As part of her plea agreement, the Government dismissed a second count of possession with intent to distribute 5 grams or more of cocaine base. The Assistant United States Attorney, however, informed the Court that the Government and Davis had not agreed upon what her sentence under the Sentencing Guidelines would be, but instead had decided to argue their different interpretations before the Court. On January 25, 1991, after receiving the report of the probation officer, briefing and oral argument from the parties, and testimony, the Court sentenced Davis to twelve months community confinement, four years of supervised release, and a $50 special assessment. This Memorandum further explains that ruling.

### I.

On August 13, 1990, Officer Victor Graves of the District of Columbia Metropolitan Police Department's Narcotics Task Force approached Davis and two black male individuals sitting in front of 1926 Savannah Street, S.E., Washington, D.C. Graves asked if there were "any rocks out," thereby indicating that he would like to buy crack cocaine. The taller male asked if the others knew Graves. When they answered that they did not, the taller one indicated that he would not sell anything to Graves. Graves began to walk away. The taller male motioned him back. Davis approached the police officer and offered him one rock of cocaine for $20.00. Graves asked for three rocks for $50.00. She replied that three rocks would cost $60.00. Graves agreed. The taller male produced a white rock-like substance from a paper bag, broke off two smaller rocks from it, and gave the rocks to the second

male who in turn handed them to Davis. In exchange, Graves handed Davis $60.00 in prerecorded funds.

Graves then left the area and instructed other members of the Narcotics Task Force to arrest three individuals: a black female in a red dress, a black male in a white t-shirt and dark pants, and a black male in a striped shirt and blue jeans. He later informed the arrest team that the black male in the striped shirt was not heavy set. Based upon this information, a group of police officers went into the apartment building at 1926 Savannah Street and arrested Davis in an apartment where she was sitting with several friends. Another group of officers arrested Christopher Sherod, who fit the description of the taller male. Graves drove by and identified Sherod as the taller male. The police found 200 milligrams of crack cocaine in Davis' clothing. On Sherod, they found 23.82 grams of crack cocaine and $40 in prerecorded funds.

On September 11, 1990, a grand jury returned an indictment against both Davis and Sherod. Count one of the indictment charged that "[o]n or about August 13, 1990 ... CHRISTOPHER J. SHEROD and TONYA E. DAVIS did ... distribute a mixture and substance containing a detectable amount of cocaine base." Count two charged that on the same date "defendants CHRISTOPHER J. SHEROD and TONYA E. DAVIS did ... possess with intent to distribute a mixture ... containing a detectable amount of cocaine base ..., and the amount of said mixture was 5 grams or more."

As previously mentioned, in return for Davis' plea of guilty to the distribution charge in count one, the Government dismissed the possession charge against her. Sherod went to trial on both counts. At trial both he and Davis testified that Sherod was not the taller male who handed Davis the 23.32 grams that she sold to Officer Graves. Graves reiterated that Sherod was involved in the transaction. Apparently believing Davis and Sherod rather than Graves on this issue, the jury acquitted Sherod of the distribution count, while convicting him of possession with

intent to distribute in excess of five grams, the count that the Government dismissed as against Davis.

The Government had introduced evidence at Sherod's trial, and the probation officer determined in Sherod's presentence report, that he possessed 23.82 grams of crack cocaine. This amount produced a base offense level of 28. *See* United States Sentencing Commission, *Guidelines Manual*, § 2D1.1 (Nov.1990) [hereinafter, "U.S.S. G."]. Because he was a first offender, his criminal history was "I," but since he stood trial, he did not receive a downward adjustment for acceptance of responsibility. His guideline range was therefore 78 to 97 months. The probation officer recommended, and the Court imposed, the 78 month minimum permitted by the Guidelines.

Including Sherod's twenty-four grams of crack cocaine in his calculations for Davis' presentence report, the probation officer determined Davis' base offense level to be identical to Sherod's: 28. In addition, he found that she had been previously arrested for theft, convicted for failing to appear on that charge, and fined for solicitation. He nevertheless calculated her criminal history category also to be "I." However, after a downward adjustment for acceptance of responsibility, the probation officer calculated her offense level to be 26, requiring her to be confined for 63–78 months, compared to a 78 to 97 month range for Sherod.

Davis objected to this determination. She contended that the crack cocaine found on Sherod should not have been factored into her base offense level. In Davis' view, she was only responsible for the 200 milligrams found in her clothing;[1] therefore, her base offense level should have been 12, and her guideline range 6 to 12 months. Davis also urged the Court to depart downward based upon evidence of the likelihood of her rehabilitation. These contentions are treated separately below.

## II.

Davis challenged the probation officer's recommendation to include the twenty-four grams of crack cocaine found on Sherod in the calculation of her base offense level on two grounds. First, she contended, Sherod was not the taller male involved in the sale to Officer Graves and, consequently, there was no connection between herself and the drugs found on Sherod. Second, even if Sherod had participated in the sale, she should not be held accountable for the drugs possessed by Sherod. Both contentions are persuasive.

## A.

■ When it acquitted Sherod of distributing crack cocaine, the jury apparently believed his contention, and Davis' testimony, that he was not the taller male who participated in the sale to Officer Graves. The probation officer and the Government urged the Court to reject the jury's assessment and adopt Graves' version of the story.[2] For the reasons stated below, it would have been inappropriate to do so in this case.

The Sentencing Guidelines do not specify whether, in sentencing a defendant upon the counts on which he has been convicted, a sentencing court may consider evidence concerning counts on which that defendant has been acquitted. The Guidelines' policy statement on the resolution of disputes states only that "the court may consider relevant information without regard to admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy." *Id.* § 6A1.3(a). Courts of appeals facing the issue have, however, uniformly ruled that sentencing courts may consider evidence relating to the "acquitted" count. *See, e.g.,*

1. The Government did not present any evidence as to the weight of the crack cocaine sold by Davis to Officer Graves.

2. These same matters were the subject of a suppression motion on October 24, 1990. However, because Sherod fit Graves' description of the taller male, it was not necessary for purposes of that motion to determine whether he actually was the taller male.

*United States v. Mocciola*, 891 F.2d 13, 16–17 (1st Cir.1989); *see also id.* (noting that the Third, Fourth and Fifth Circuits have reached similar conclusions). The rationale is that while the Government must prove facts at trial beyond a reasonable doubt, at sentencing the Government need only prove facts by a preponderance of the evidence. *See id.* at 16. While our Court of Appeals expressed some reservations about this rationale in a pre-Guidelines case, it nonetheless allowed the trial court in that case to reconsider evidence apparently rejected by the jury. *See United States v. Campbell*, 684 F.2d 141, 152–55 (D.C.Cir.1982). It is therefore likely that our Court of Appeals would interpret the Guidelines to allow a sentencing court to consider evidence from an "acquitted" count.

It does not, however, follow that our Court of Appeals would require or even recommend doing so in all cases. Quite to the contrary, in *Campbell*, the Court of Appeals noted that "assessing witness credibility is a task that is primarily within the province of the jury." *Id.* at 154. Sentencing courts should therefore be wary of rejecting a jury's assessment of witness credibility. The Government, however, urges the Court to do just that. The jury apparently found the testimony of Davis and Sherod that Sherod did not participate in the sale to Officer Graves more credible than Graves' testimony that he did. The Government urges the Court, nevertheless, to credit Graves' testimony and reject that of Davis and Sherod. It has failed, however, to offer any compelling reason to do so. Thus, whether or not it would be appropriate to reject the jury's apparent determination of the credibility of witnesses in an exceptional case, it is not appropriate to do so here.

Furthermore, in this case the Government is asking the Court to do something that is apparently unprecedented: It is urging the Court to sentence Davis based upon evidence adduced a trial to which she was not a party. As stated from the bench at sentencing, "[t]here is something that violates fundamental fairness to charge Davis and sentence her for up to five years of confinement for allegedly assisting someone ... whom the jury has found not guilty for his role in the [same] alleged course of conduct, common scheme, or plan." Transcript at 3 (copy attached). Unlike the defendant in *Campbell*, Davis did not have a full opportunity to refute the Government's case because that case was presented at Sherod's trial, not her own. *Cf. Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (allowing the application of collateral estoppel only when the parties have had a "full and fair opportunity" to litigate). The unfairness of being judged according to evidence presented at another's trial is mitigated somewhat by the fact that Davis was able to testify at a suppression hearing and at the trial itself and that her counsel was able to cross-examine Graves at the former hearing. Nevertheless, because it was Sherod's motion and not hers, Davis was not in a position to call her own witnesses or present her own evidence. Nor was it to be reasonably anticipated at the time of the suppression hearing how important it was for Davis to rebut Graves' testimony that Sherod was the taller male.

In addition, "[t]o impose a sentence on Davis for participation in an act which the only jury to consider the matter has decided did not happen would be a gross violation" of the Guideline's goal of eliminating unreasoned disparity in sentencing. Transcript at 3. The relative similarity in the Guideline treatment of Davis and Sherod is one of the sorts of aberrations that Congress sought to eliminate by enacting the Sentencing Guidelines. There is something wrong with the imposition of virtually the same sentence on the distributor and the addict-user where the only jury to consider the matter has acquitted the distributor of responsibility for the very transaction that links his inventory to the addict-user.

In light of these considerations, it would be inappropriate to reject what is apparently the jury's assessment of the conflicting testimony on whether Sherod was the taller male. Accordingly, for the purpose of sentencing, Davis must be deemed not to have

been involved in possessing or distributing the crack cocaine found on Sherod.

## B.

■ Davis also contended that, even if the Court were to proceed on the hypothesis that Sherod was the taller male involved in the sale to Officer Graves, she would nevertheless not be accountable for crack cocaine found upon him.

First of all, Davis asserted that she did not know that the taller male had any more crack than he gave her to sell to Graves. However, this assertion contradicts the evidence adduced at the suppression hearing. After Graves asked Davis for some cocaine and she went to the taller male to get it, Graves saw the taller male produce a large rock of crack cocaine and break off smaller pieces. Since Davis was walking back to get the crack, it is reasonable to infer that she also saw the taller male do that. More fundamentally, Davis testified that she was seeking crack cocaine for her own use in exchange for her services. She must therefore have known that the taller male had more than the three rocks he sold Graves.

Davis next contended that even if she did know that the taller male had additional drugs, the drugs in his possession should not be considered in determining her sentence under the sentencing guidelines because they were not related to Davis' offense of distributing cocaine. The premise of Davis' argument—that in determining her guideline range only the offense for which she has been convicted may be considered—is not correct. The Sentencing Commission originally attempted to formulate a system that disregarded the formal charges against individuals and sentenced based entirely upon a defendant's actual conduct. *See* U.S.S.G. ch. 1, pt. A., § 4(a). Although practical difficulties forced the Commission to abandon its attempt to formulate a "real offense" system, it did not adopt a pure "charge offense" system either. *See id.* Instead, the Commission adopted a mixed system which bases sentences primarily upon the offense of conviction, but also considers a limited amount of

"real offense" information in determining an individual's guideline range. *See, e.g., United States v. Blanco,* 888 F.2d 907, 911 (1st Cir.1989) (Breyer, J.); Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest,* 17 Hofstra L.Rev. 1, 8–12 (1988). If it is assumed that Sherod was the taller male, the question then is whether his possession of additional crack cocaine is the sort of real offense information that may be considered in calculating Davis' guideline range.

Section 1B1.3 defines "relevant conduct," the real offense information that may be used to calculate a defendant's guideline range. For most crimes, "relevant conduct" covers only

> acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....

U.S.S.G. § 1B1.3(a)(1). Thus, in most cases, courts may only consider real offense information directly related to the offense of conviction. Crimes that are ongoing or continuous in nature are treated differently because, in the Sentencing Commission's opinion, such crimes "cannot readily be broken into discrete identifiable units that are meaningful for purposes of sentencing." *Id.* § 1B1.3 comment. (backg'd). Therefore, courts may consider,

> solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction....

*Id.* § 1B1.3(a)(2). Section 3D1.2(d) lists the offenses for which multiple counts should be grouped together and considered as a single offense. *See id.* § 3D1.2(d). Possession with intent to distribute cocaine is one of the offenses on that list. *See id.* (citing § 2D1.1, "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit

These Offenses)"). It would therefore appear that the broader version of relevant conduct in section (a)(2) applies to Davis.

Nevertheless, Davis contended that section (a)(2) does not apply. She argued that she was convicted of only one count and, therefore, no "grouping of multiple counts" was necessary. This argument misapprehends the reference to § 3D1.2(d) in section (a)(2). Section (a)(2) does not incorporate § 3D1.2(d); it refers to the latter section in order to identify the types of offenses that trigger the broader relevant conduct inquiry. Simply put, "[a]pplication of this provision does not require the defendant, in fact, to have been convicted of multiple counts." *Id.* § 1B1.3 comment. n. 2; *accord United States v. Turner*, 898 F.2d 705, 711 (9th Cir.1990); *United States v. White*, 888 F.2d 490, 492 (7th Cir.1989) (collecting cases). Consequently, section (a)(2), and its broader scope of relevant conduct, applies to Davis' sentence.

In keeping with its contention that Sherod was the taller male, the Government contended that the sale of the three rocks to Officer Graves was "part of the same course of conduct" as Sherod's possession with intent to distribute the twenty-four grams of crack cocaine found on him at the time of his arrest. If Graves' identification of Sherod is accepted, this contention is clearly correct. It does not, however, necessarily follow that those twenty-four grams should be included in the calculation of Davis' guideline range. A basic principle underlying the Sentencing Guidelines is that a defendant's guideline range may only be calculated with regard to conduct for which that defendant is "accountable" or responsible. *See, e.g.,* Wilkins & Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C.L.Rev. 495, 510–11 (1990). Thus, a defendant may only be sentenced with respect to "acts or omissions committed, aided, or abetted by the defendant, or for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1). In the case of conspiracies or "criminal activity undertaken in concert with others," defendants are "otherwise accountable" for the "conduct of others in furtherance of

the execution of the jointly-undertaken activity that was reasonably foreseeable by the defendant." *Id.* § 1B1.3 comment. n. 1. They are not, however, responsible for all the acts of their cohorts:

> Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

*Id.; see also id.* § 1B1.3 comment. n. 2 (noting that section (a)(2) incorporates the responsibility language of section (a)(1)).

Davis testified that she helped the taller black male in a single transaction in order to procure some crack *for herself,* and her testimony was corroborated by other evidence. She did not have any prerecorded funds when she was arrested. She had only a single dose of crack cocaine. Moreover, even though the arrest team moved in shortly after Officer Graves' purchase, she was not found on the street, but rather in her apartment with other people, apparently relaxing. This evidence—which has not been contradicted by any evidence presented by the Government—suggests that Davis helped the taller black male with the sale to Officer Graves, obtained some crack for her troubles, and returned to her room to enjoy it. There is *no* evidence, or basis for any inference, that the taller male and Davis engaged in any other jointly undertaken drug trafficking or transaction before or after the Graves sale.

The Government argued that the fact that Davis only "steered" Graves to the taller male does not immunize her from criminal responsibility. In support of this contention, the Government cited *United States v. Copeland*, 902 F.2d 1046 (2d Cir. 1990). The Government, however, reads too much into this case. Although the Second Circuit held that a defendant acting as a "steerer" was accountable for all the cocaine found on the drug dealer, it also found that the key item of evidence was the drug dealer's admonishment to Cope-

land, "How many times have I told you not to bring anyone up here." *Id.* at 1047. Based upon this evidence, the Second Circuit determined that Copeland was involved in an ongoing series of transactions:

> The record makes plain that Copeland's steering of the undercover agent was not an isolated event. Copeland indicated that he had had several past dealings with Jackson and Whaley, and Jackson's comment when Copeland brought the agent to the balcony revealed that Copeland had brought potential customers to the balcony on a number of prior occasions.

*Id.* Thus, while *Copeland* establishes that a steerer paid in kind *may* be responsible for the drugs found on the drug dealer that he or she helped, it does not establish that steerers are necessarily responsible for such drugs. The Government must show that the distribution of those drugs was within the scope of the agreement between the dealer and the steerer.

The Government has not made that showing. It has failed to present any evidence suggesting that Davis' helping the taller man "was not an isolated event." Quite to the contrary, the evidence at the scene of the crime suggests that it was. As a consequence, the Government has not met its burden of showing by a preponderance of the evidence that Davis agreed to help the taller male distribute more drugs or that his further possession of cocaine was in any way connected with their jointly undertaken activity. In short, even if Sherod were the taller male, Davis would not be responsible for the twenty-four grams found upon him, and that quantity could not be used in the calculation of Davis' guideline range.

### C.

In summary, given the jury's apparent acceptance of Davis' testimony and its rejection of Graves', as well as the unfairness and disparity that would be created by rejecting the jury's assessment in this case, Sherod cannot be deemed to be the taller male who participated in the sale to Officer Graves. Furthermore, even if Graves' testimony could be credited and it were assumed that Sherod was the taller male, Davis could not be held accountable for the twenty-four grams of cocaine found upon Sherod because there is no evidence that she did anything more than participate in a single drug transaction. As a consequence, under either theory, the twenty-four grams should not be considered in calculating Davis' guideline range. Because the remaining two hundred milligrams for which Davis is accountable translates into a base offense level of twelve and a total offense level of 10, Davis' appropriate guideline range was 10–16 months.

### III.

Davis also urged the Court to depart from the Guidelines due to her exceptional efforts at rehabilitation and the likelihood that those efforts will succeed.

### A.

■ As a threshold matter, the Government contends that Congress prohibited consideration of rehabilitation and that the Sentencing Commission considered, but rejected, downward departures for victims of drug addiction. Both contentions misconstrue Davis' argument. Although Congress prohibited "imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant," 28 U.S.C. § 994(k) (1988), it did not preclude consideration of "the possibility of rehabilitation as an appropriate factor in determining the length of a sentence." *United States v. Harrington*, 741 F.Supp. 968, 975 (D.D.C. 1990). Indeed, the Senate Report specifically noted that "the purpose of rehabilitation is still important in determining whether a sanction other than imprisonment is appropriate in a particular case." S.Rep.No. 98–225, 98th Cong. 2d Sess 76–77 (1983) *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3259–60.

Similarly, although the Sentencing Commission rejected the notion that drug abuse mitigates an individual's culpability for his or her crimes, it is entirely consistent with that position to depart downward based

upon the likelihood of successful treatment for drug addiction. The relevant policy statement notes that

> Drug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines. Substance abuse is highly correlated to an increased propensity to commit crime.

U.S.S.G. § 5H1.4. Nothing in this statement suggests that the Commission considered the likelihood of successful treatment. In fact, a downward departure based upon the likelihood of successful treatment is entirely consistent with the Commission's rationale. The policy statement reasons that drug dependence does not mitigate an individual's culpability because substance abuse "is highly correlated to an increased propensity to commit crime." Once, however, an addict is successfully treated for drug addiction, that propensity is reduced. As a consequence, under the Commission's own reasoning, the likelihood of successful drug treatment "reduce[s] the need for longer periods of incarceration contemplated by the Guidelines with respect to drug law violations." *Harrington*, 741 F.Supp. at 976; *accord United States v. Maddalena*, 893 F.2d 815, 817 (6th Cir.1989); *United States v. Floyd*, 738 F.Supp. 1256 (D.Minn.1990); *United States v. Rodriguez*, 724 F.Supp. 1118, 1119 (S.D.N.Y.1989) (Leval, J.); *but see United States v. Pharr*, 916 F.2d 129, 133 (3rd Cir.1990).

■ In the alternative, the Government argues that the Sentencing Commission has already considered the likelihood of successful drug treatment. By awarding a two-level reduction in the offense level for acceptance of responsibility, the Government argues, the Sentencing Commission has determined the proper treatment of rehabilitation and therefore precluded further reductions in sentence based upon the likelihood of successful drug treatment. In support of this contention, the Government points to decisions from the First and Fourth Circuits. *See, e.g., United States v. Studley*, 907 F.2d 254, 259 (1st Cir.1990); *United States v. Van Dyke*, 895 F.2d 984 (4th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 112, 112 L.Ed.2d 82 (1990). These

decisions, however, only note that the Guidelines consider evidence of a desire for rehabilitation. *See Van Dyke*, 895 F.2d at 987 (noting that § 3E1.1 provides for consideration of voluntary restitution, surrendering to the authorities or assisting in the recovery of the fruits of a crime). They do not address concrete evidence of a *likelihood* of successful treatment of the drug addiction that was a primary cause of an individual's criminal behavior. As a consequence, even though the Sentencing Commission may have considered evidence of a desire for rehabilitation, it did not consider how a court should react to compelling evidence of a likelihood of rehabilitation through successful drug treatment.

■ Accordingly, it is appropriate to depart from the Guidelines based upon evidence of a substantial likelihood of successful drug treatment.

### B.

Davis has presented such evidence. There is little doubt that Davis' drug addiction is at the root of her criminal behavior. Although she is not a first-time offender, her previous offenses have been minor and clearly related to her drug habit. Until she was more than 25 years of age, Davis had no record. It was only after she became addicted to crack cocaine that she was arrested. It is not surprising therefore that both of the crimes for which she was arrested involved money. In 1988 she was arrested on a minor theft charge, and in April of 1990, she was arrested for solicitation and fined $50. Davis was also convicted of violating bail conditions, but that violation was in connection with the 1988 theft charges. Thus, the evidence indicates that Davis' criminal behavior is directly attributable to her drug addiction.

At the presentence hearing, Davis presented convincing evidence of a substantial likelihood that she will be able to treat her addiction successfully. Teresa Davis (no relation), the assistant administrator at the halfway house where the defendant has been incarcerated since October, testified on defendant's behalf. Davis has a bach-

elor of arts from Lincoln University and a masters degree from the University of the District of Columbia. Moreover, she is currently working on a doctorate in education from Grambling State University. For twelve years, she was a project director in the D.C. Public Schools and worked with children who were born or had become addicted to drugs. For the last five years, she has worked at the halfway house. Under the normal rules of evidence it is likely, and in any event it is certain under the relaxed rules of evidence which obtain in sentencing proceedings, that Teresa Davis was qualified as an expert on the treatment of drug addiction.

She testified that during her five months there defendant had participated in the drug treatment programs at the halfway house to the fullest extent possible, and regular urine tests have shown no indication of drug use. This record alone indicates some likelihood of success:

> Research indicates that those who spend more than three months in a [therapeutic community]—even without completing the program—reduce drug use and criminal behavior.

Office of National Drug Control Policy, *Understanding Drug Treatment* 15 (June, 1990).

As the Government points out, the successful completion of a drug program in a halfway house is not exceptional. Defendant has, however, provided other evidence of her likelihood of successful treatment. According to Teresa Davis, many drug addicts do well in the structured environment of a treatment program but founder when they are released because they lack strong support systems. Defendant has shown that she has such support. Teresa Davis, who has counseled the defendant since she arrived at the halfway house, has agreed to continue counseling Davis after she is released. Defendant has also expressed interest in participating in the out-patient program being developed at the halfway house. Furthermore, her sister testified movingly to the manner in which Davis has been reincorporated into her family and promised that she and her mother, who is currently taking care of Davis' three-year-old child, would provide additional support. Finally, Davis has recently been baptized and accepted into a prison ministry experienced in helping reforming drug addicts. Based upon the evidence of this extensive support network, her academic training, and her experience in the field, Teresa Davis testified that Davis has an exceptional chance of successfully treating her drug addiction. This testimony, which was uncontradicted, supports a finding that there is an extraordinary likelihood of successful treatment of the drug addiction at the root of Tonya Davis' criminal behavior.

It is also important to note that Davis has shown evidence of an unusual level of responsibility. She has not so much as violated a curfew at the halfway house and has earned herself the highest privileges there. Moreover, she has served as a volunteer and then a paid employee at the Sunshine Multi–Service Center counseling mentally retarded individuals. She also holds a second job as a secretary. Teresa Davis testified that both Tonya's punctilious compliance with halfway house rules and Tonya's insistence on working two jobs has made her a model client who stands out from the three hundred or so others whom Teresa Davis has seen at the halfway house in her five years there.

The fact that Davis' offenses are attributable to her drug addiction does not absolve her of responsibility for her actions, nor does it obviate the need for punishment. It does, however, suggest that if she can successfully treat that addiction, there is less need to incarcerate her. Because Davis has shown a substantial likelihood of doing so and because she has displayed an unusual level of responsibility, she should be confined in a community confinement facility where she can continue her treatment and her employment rather than incarcerated in a prison. The public's interest in retribution for her minor participation in a single sale of cocaine base will be more than adequately satisfied by her year-long confinement, and its concern over the possibility of recidivism is adequately met by four years of supervised release.

### C.

Accordingly, even if Davis had been found accountable for the cocaine possessed by Sherod, a downward departure from the guideline range of 63–78 would have been appropriate.