UNITED STATES of America, Plaintiff–Appellee and Cross–Appellant,

v.

Randolph SHORT, Defendant–Appellant and Cross–Appellee.

Nos. 90–4077 and 90–4085.

United States Court of Appeals, Tenth Circuit.

Oct. 31, 1991.

Wayne T. Dance, Asst. U.S. Atty. (Dee V. Benson, U.S. Atty. with him on the briefs), Salt Lake City, Utah, for plaintiff-appellee and cross-appellant.

Craig S. Cook, Salt Lake City, Utah, for defendant-appellant and cross-appellee.

Before HOLLOWAY and BRORBY, Circuit Judges, and BRIMMER,* Chief District Judge.

BRORBY, Circuit Judge.

This appeal and cross appeal stem from Randolph Short's (Defendant or Short) federal conviction in Utah for manufacturing methamphetamine.[1] Defendant appeals alleging the district court erred by failing to suppress incriminating statements Defendant made following his arrest. He also claims the district court improperly allowed the jury to be told of his prior felony drug conviction. Both Defendant and the United States (Government) appeal the district court's sentencing decisions made following Defendant's conviction.

I.

On Sunday, August 20, 1989, at approximately 10:15 p.m., federal Drug Enforcement Administration (DEA) officers, in cooperation with state and local police, executed a search warrant at Defendant's Salt Lake City area home. The search of Defendant's home was part of a plan to simultaneously search several locations in the Salt Lake City area for evidence of illegal drug activity. The searches were coordinated so the suspects could not warn each other. Once inside, police found evidence of a methamphetamine manufacturing lab in Defendant's residence. While Short's home was searched police detained several individuals including Defendant, his 11-year-old daughter Angela, Defendant's girlfriend, and another man.

The testimony concerning what happened during the police raid and immediately after is conflicting. Defendant was injured in a motorcycle accident nine days before the raid; he was hospitalized for approximately five days. On the night of the raid both his arms were still in casts due to injuries that included a compound wrist fracture and a broken finger. Defendant also suffered a broken nose and was wearing a bandage due to an additional facial injury that required 100 stitches. His right leg was also injured.

Defendant testified that on the night of the raid he was taking doctor-prescribed Percodan and Hydracodeine every four hours for pain. Defendant claimed he was in a great deal of pain and misery due to his injuries and the pain medication relaxed him, made him forget where he was, and allowed him to sleep. Defendant's girlfriend testified that on the day of the raid Defendant was sleeping a lot and awoke

---

* The Honorable Clarence A. Brimmer, Chief United States District Court Judge for the District of Wyoming, sitting by designation.

1. The federal laws Defendant was convicted of violating are 21 U.S.C. §§ 841(a) (attempt to manufacture and manufacturing methamphetamine) and 846 (attempt or conspiracy).

only to eat and take his pain pills. She also testified that when the police arrived they were unable to properly handcuff Defendant because of his casts. She claimed they handcuffed his right arm to his left foot, requiring him to hop around on his injured leg. Defendant agreed the way the police initially handcuffed him made it difficult for him to move and he had to hop around on his right leg.

As previously mentioned, the testimony conflicts. While testimony offered by Defendant indicates he was in physical pain and was mentally impaired due to medication, the testimony of law enforcement agents is of a different view. According to them, Defendant was coherent and in control of his mental faculties. They felt there was no reason to believe he was incoherent or that he did not understand what was being said to him. For example, one of the officers testified Defendant realized when police were handling a container of hydriodic acid, and he warned officers to be "very careful with that stuff because ... it was very harmful." This officer admitted Defendant looked like he was in pain, "but he never stated he was in an overabundance of pain whatsoever." The officer noticed Defendant was "handcuffed rather strangely." But he also mentioned the police eventually found another more comfortable way to handcuff him.

Defendant acknowledged the way he was handcuffed was changed after he "kept complaining about being in pain because of the way I was handcuffed." Defendant further testified he was given two pain pills after he complained about being in pain although at first his request was refused. The officer who Defendant said gave him the pills did not recall doing so.

In addition, Defendant was concerned about his 11–year–old daughter and requested she be released. It is undisputed she was handcuffed during the raid, although the testimony varies on how long she was handcuffed. The defense says she was handcuffed for four hours, while the police maintain the handcuffs were removed around midnight, which is less than two hours after the raid began. During the trial the girl testified she cried when she was handcuffed, but also remembered she was given a blanket, allowed to sit near her father and watched a movie with a female police officer. The girl's mother testified at the suppression hearing and reported her daughter suffered from nightmares and eating difficulties and was in therapy following the raid.

Defendant asserts he "complained numerous times" about having his daughter in handcuffs because she "had nothing to do with it." Defendant testified he was told things would drag out until he talked to the police and that it was his impression "the quicker that everything went, the quicker we would be over and the quicker she could be released." Defendant said it was "hurting me inside" about what was happening to his daughter and his main concern was his daughter's well-being.

The police have a different story. The federal agent in charge who spoke to Defendant said he wanted to release the girl and said he answered Defendant's concerns by telling him his daughter would be released at the "appropriate time." The state officer who questioned Defendant remembered Defendant was concerned about his daughter. He also told Defendant it would be "just a short period of time ... before we were able to not only release her, but have someone either pick her up or take her to a location, and I assured him that would be done." Later, when Defendant asked him about a comment he heard indicating the girl would not be released, the officer again told Defendant there was a "high probability" she would be let go.

## II.

On appeal, Defendant objects to the district court's refusal to suppress incriminating statements Defendant made to two officers shortly after the raid. According to Defendant, "[t]he physical pain factor and the taking of drugs should itself eliminate any finding of voluntariness of Defendant's statements." He further asserts there can be no question his statements were coerced if his physical condition is considered along with the "psychological

pressure" he suffered because his daughter was also detained. These arguments allege Defendant's statements were coerced in violation of the Fifth Amendment.

Some of the incriminating statements—which amount to a confession of being involved in illegal drug activity—were allegedly made by Defendant around 3:00 a.m. when he spoke to DEA Agent Fillmore. The agent testified at the suppression hearing and said Defendant told him he knew about the methamphetamine in his house and admitted to processing some of the chemicals in the lab so he could sell methamphetamine. Officer Sawaya, a detective in the Salt Lake City police narcotics unit talked separately with Defendant. He testified Defendant said he was paid by another individual to live in the house and to run interference by making noise when others were inside "cooking" methamphetamine. Both men claimed Defendant was advised of his constitutional rights and waived them before speaking. During the suppression hearing Defendant testified he did not know there was a methamphetamine lab in the house. He testified an acquaintance was using the room where the lab was for storage and that the room was locked by that individual. He admitted to storing some old work clothes and business papers in the room, but maintained the lab was set up without his knowledge. Defendant said the acquaintance started using the room while he was out of town and said the room had a lock on the door when he returned from his trip.

■ Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt. *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964) (citing *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897));

*United States v. Fountain,* 776 F.2d 878, 885 (10th Cir.1985). In determining whether a particular confession is coerced, some factors we consider include the intelligence and education of the individual being questioned, whether he was advised of his constitutional rights, the length of detention, the prolonged nature of the questioning, and whether the individual was physically punished. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Since no single factor is determinative, we must be mindful of all the surrounding circumstances, including the defendant's characteristics. *Id.; United States v. Falcon,* 766 F.2d 1469, 1476 (10th Cir.1985). The ultimate issue of voluntariness is a legal question reviewable de novo, *United States v. Fraction,* 795 F.2d 12, 14 (3d Cir.1986), although the trial court's rulings regarding "subsidiary factual questions, such as whether the police intimidated or threatened a suspect or whether the suspect was particularly susceptible to police coercion, are subject to review under the clearly erroneous standard." *United States v. Chalan,* 812 F.2d 1302, 1307–08 (10th Cir.1987). In a case where a defendant appeals the denial of his motion to suppress, we review the evidence in the light most favorable to the Government. *Falcon,* 766 F.2d at 1476; *United States v. Brown,* 540 F.2d 1048, 1053 (10th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977).

■ In refusing to suppress Defendant's statements to the police, the district court said Defendant understood and knowingly and voluntarily waived his rights. The court rejected Defendant's argument that his waiver was compromised because he was in pain or taking pain pills. The court also discounted Defendant's argument concerning his daughter. The court credited the testimony from the police which stated Defendant was told his daughter would be released as soon as the investigation was over.[2]

---

2. The district court's ruling on Defendant's motion to suppress was made from the bench: Yes. I'm going to deny the motion to suppress. I find that the *Miranda* warning was

given. The defendant understood his rights, and there is no factual basis on which this Court could base a finding that there was a lack of knowledge and voluntary intelligent

The careful and independent record review we conducted convinces us the district court did not err in its ruling. The district court was free to credit the testimony of the police officers over testimony offered by defense witnesses at the suppression hearing. We find no clear error in the district court's factual determinations in this regard. Our independent review of the record further convinces us that Defendant's statements were not impermissibly coerced by the police as a matter of law.

Without condoning the detention of Defendant's 11–year–old daughter in handcuffs or the questioning of Defendant without inquiry into his ability to respond despite his visible pain, *see, e.g., United States v. McShane,* 462 F.2d 5, 7 (9th Cir. 1972) (dicta noting that unfounded threats to arrest and prosecute a loved one may make a confession involuntary), the record supports admissibility of the statements at issue. Agent Fillmore, early on, made it clear to Defendant that his daughter was not a suspect and would eventually be released from police custody. *Cf. United States v. Tingle,* 658 F.2d 1332, 1336–37 (9th Cir.1981) (finding statements involuntary where interrogation sought to cause fear that suspect would be separated from her child for a long time). In addition, Defendant never told his questioners that he felt too ill or groggy to answer questions. Despite the pain and the drugs, he not only conversed intelligently with his questioners but also tried to *negotiate* for "advantages" should he cooperate. Testimony in the record indicates Defendant warned that one of the chemicals found in his home was dangerous and required careful handling. Additionally, Defendant noticed when police officers seized an antique gun. He complained about the seizure of the weapon and asked police not to take it because it was an older model and apparently a collector's item. At the suppression hearing, Defendant recalled he was told of his constitutional rights. Finally, Defendant testified about his continued ability to reject efforts by his questioners to mischaracterize his statements.

These examples support our conclusion that Defendant's pain was not so great, nor was his mind so clouded by pain pills that he was unable to think and converse with the police freely and intelligently on several subjects. *See United States v. Casal,* 915 F.2d 1225, 1229 (8th Cir.1990) (lack of evidence of impairment and demonstrated ability to say "no" to police showed voluntariness), *cert. denied,* ‒‒ U.S. ‒‒, 111 S.Ct. 1400, 113 L.Ed.2d 455 (1991). Our review of the record convinces us Defendant's will was not overborne by the police. His comments were not the result of impermissible police coercion. Quite the contrary, we hold his confession was " 'the product of a rational intellect and a free will.' " *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)). Our holding is based on our assessment of all the surrounding circumstances. *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Falcon,* 766 F.2d at 1476.

■ Defendant next asserts the federal agents erred by detaining him while searching the premises for some six hours.

The federal statute governing admissibility of confessions provides that a confession is not generally inadmissible solely because of delay in bringing a person before a magistrate if the confession was voluntarily made within six hours immediately following arrest or detention.[3] De-

---

waiver of those rights, either based on the pain or medication or the fact that the daughter was being detained.

I seem to recall that even Agent Sawaya testified that the defendant agreed that it would be okay as long as she was released after an explanation was made that the daughter would be released as soon as the investigation was over.

In any event, I understand your position, but the motion is denied. Also, the motion with respect to the Fifth Amendment is denied.

3. The relevant portion of the statute reads:

(c) In any criminal prosecution by the United States ... a confession ... shall not be inadmissible solely because of delay in bringing such person before a magistrate ... if

fendant does not contend he confessed more than six hours after his arrest or detention. Defendant's confession thus falls within the time frame set by the law. Furthermore, we have already held Defendant's confession was voluntary and have therefore addressed the "sole constitutional requisite governing the admission of a confession in evidence." *United States v. McCormick*, 468 F.2d 68, 75 (10th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973). We note the six-hour time limit is merely a factor in determining voluntariness, and confessions taken more than six hours after arrest can be admitted. *Id.* at 74; 18 U.S.C. § 3501(a)-(e). *See also United States v. Shoemaker*, 542 F.2d 561, 563 (10th Cir.) (voluntariness is the sole test for admitting a confession and delays caused by a defendant do not render the confession inadmissible), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976).

■ Defendant's final complaint concerning his incriminating statements takes issue with the police failure to record their conversations with him either by taking notes or by using a tape recorder. Defendant's argument that the police were well equipped and should have had an inexpensive tape recorder to record Defendant's remarks is a veiled accusation that the officers purposely failed to record Defendant's remarks so that they could later exaggerate or lie in court without fear of impeachment. Defendant's counsel candidly admitted to the district court he had no law to support his position. Nor has he cited any to us in his brief on appeal.

We agree with the Government that the district court's action here is an evidentiary ruling reviewable only for an abuse of discretion. *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988). The district court was in the best position to judge the credibility of the police officers and defense witnesses at the suppression hearing. In ruling against Defendant at the

suppression hearing, the court obviously felt the Government's witnesses were more credible than the defense witnesses. It might be better procedure for the police to electronically record all conversations with criminal suspects. However, after reviewing the record, we do not feel the district court abused its discretion in denying Defendant's motion. *United States v. Valdez*, 880 F.2d 1230, 1233 (11th Cir.1989) (inculpatory statements admissible although officers failed to take notes or record statements); *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir.1977) (FBI agent may testify regarding defendant's confession even though the agent did not electronically record the confession).

### III.

■ Defendant's next complaint concerns the evidentiary matter of his prior felony drug conviction. Defendant contends the district court committed prejudicial error in allowing the Government to inform the jury of his prior drug conviction. Defendant argues "[t]he prejudicial effect of informing the jury of a related drug offense far outweighed any value such knowledge would have especially in light of the fact that Defendant never denied involvement with drugs but only with the manufacturing of drugs." Defendant asks us to remand for a new trial because of the alleged error in admitting the evidence.

The prejudicial effect of Defendant's prior felony drug conviction was first raised by Defendant during the pre-trial suppression hearing. Defendant filed a motion in limine asking the district court to bar the Government from impeaching Defendant with the prior conviction. During the hearing, defense counsel stated Defendant's position at trial would be that he did not know a drug lab was in his home. However, defense counsel stated Defendant would not contend he had no knowledge of drugs. Thus, according to Defendant's

---

such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury *and if such confession was made or given by*

*such person within six hours immediately following his arrest or other detention....*
18 U.S.C. § 3501(c) (emphasis added).

lawyer, telling the jury about Defendant's prior drug possession conviction would be evidence that was too prejudicial under Fed.R.Evid. 609(a).[4] Defendant's lawyer argued:

> No doubt the defendant is going to argue, and I think it's the Government's evidence. If the Government puts on evidence, I'm going to testify that under the circumstances in this case, that there is no evidence the defendant was participating in this laboratory.
>
> If the defendant does take the stand and testify that he has never seen drugs before in his life, that he's never used drugs before in his life, then I think the Government certainly could impeach him. I will stipulate if the defendant gets on the stand and claims to be the kind of person who would be outraged and indignant if he heard that anyone had drugs anywhere near his house or something like that, if he took that sort of approach, then they could bring it out.
>
> But I think if the defendant admits he has used drugs in the past but claims that he does not have any idea how to run a sophisticated pharmaceutical laboratory which involves apparently a great deal of noise, he is going to say: No, I didn't have any idea of how to do that nor was I doing it. Those people were using that storage room, and it wasn't my business. I don't think then that they could bring up the felony conviction. That's the question.
>
> MR. DANCE: Under 609 prior felony conviction we certainly could.
>
> MR. O'CONNELL: Well, that's the question. I'm saying as to credibility, I don't think that the felony conviction in the circumstances of this case, I don't think the Government can show that the probative value on the question of credibility that this is, that this possession of a half·gram of cocaine shows so much about the defendant's credibility the jury should have that, even though there is the unpermissible [sic] that outweighs the prejudicial effect of having them know he was convicted of another offense.
>
> In other words, the question is, does the actual probative value on credibility outweigh the prejudice. And I suggest where it's a drug offense, the prejudice is high whereas the credibility, the probative value on credibility is relatively low.

After hearing this argument, the district court granted Defendant's motion in part, ruling from the bench:

> THE COURT: All right. I'm going to grant the motion to sever Count 3 from the other counts. With respect to the motion in limine, I'm going to deny the motion in limine with the understanding that if the defendant elects, *the Government will be required to simply refer to the matter as a prior felony conviction, rather than the specific matter of a prior drug felony conviction.*
>
> As to the question of the latitude of the Government in cross-examining in the event the witness—or the defendant takes the witness stand, I'll wait and see where we are and whether on broad issues of knowledge and other such things as may be testified about, the Government could nevertheless cross-examine and get in questions of prior drug usage.

(Emphasis added.)

Defendant testified at trial and maintained he was neither aware of nor involved with the drug lab found in his home. Defendant's position was stated during direct examination on questioning from his attorney:

> Q. Did you ever tell [DEA Agent] Curtis Fillmore that you had processed methamphetamine in that laboratory?
>
> A. No, sir, I didn't.
>
> Q. Had you ever processed methamphetamine in that laboratory, either in the indoor store room or the outdoor store room?
>
> A. No, sir.

---

**4.** Federal Rule of Evidence 609(a)(1) states that evidence that an accused has been convicted of a crime punishable by death or imprisonment for more than one year "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."

Q. Were you aware that anyone was processing methamphetamine in either of those store rooms?

A. No, sir, I was not.

. . . .

Q. Did you get any money, that you were aware of, for doing anything with regard to methamphetamine at that residence?

A. No, sir, I did not.

The very first questions on cross-examination by the Government concerned Defendant's criminal record. And, in spite of the trial judge's earlier ruling, the prosecutor asked Defendant about his prior drug conviction:

Q. Mr. Short, you're a convicted felon, aren't you?

A. Yes, sir.

. . . .

Q. And that was a drug-related felony, wasn't it?

A. Yes, sir.

At the next break, Defendant's attorney objected to the prosecutor's violation of the judge's earlier ruling and asked for a mistrial:

THE COURT: All right. We're in open court. The jury is not present. It's in the jury room. You have a motion, Mr. O'Connell?

MR. O'CONNELL: Yes, Your Honor. The defendant moves for a mistrial based on counsel for the Government's question to the defendant: The felony you were convicted of was a drug offense, wasn't it? I did not have—it came out so fast, and I had instructed the defendant when the questions were asked to answer quickly. He did answer quickly.

My understanding was that as far as for purposes of impeachment, just because the defendant was a witness, Counsel would be allowed to ask him if he was convicted of a felony, so I understood that. I believe going into it was a drug offense—the defendant had not made any claim that he did not have any knowledge of drugs generally. He said: I did not know what was inside that room.

. . . .

At no time during the direct testimony did he in any way imply that he had never used drugs or that he had—he wouldn't know what drugs looked like if he saw them. His point was he hadn't seen that laboratory inside.

The fact that he had a prior drug conviction for possession of cocaine doesn't go to that issue whether he knew what was on the other side of a locked door. He could have been a professional drug dealer all of his life, and he would still have the right to say: I didn't know what was on the other side of that door.

Now, if he had got up and said: Well, yes, I saw people using white powder and snorting it up their nose, but I didn't know what that was, then you bring out the person had a familiarity with that kind of activity. But when somebody says: I don't know what's on the other side of the door, you can't just bring up that: You're a criminal, or you've possessed drugs in the past. That is exactly the sort of thing the rule prohibits.

My understanding was when we got to that, the secondary issue of whether he opened that up, then we would have a discussion, and the Court would rule at that time. But he did it in such a way and he did it so fast that I didn't have an opportunity to object. I saw no point in stirring it up with the jury after it came in. I was going to wait for the next opportunity, and this is it. Thank you.

The prosecutor responded that his questions were entirely consistent with the district court's earlier ruling. Following his response the district court ruled there was no error in alerting the jury to Defendant's prior felony drug conviction:

MR. DANCE: Well, Your Honor, I certainly must have had a different interpretation of our earlier discussion today and the Court's ruling at that time than Mr. O'Connell. It was my rather clear understanding that the Court ruled that the Defendant, like any witness, can be impeached with a prior offense.

But if his testimony involved putting into issue the critical element of knowl-

edge and intent in this case, that then the nature of the prior felony offense would be relevant. And so the weight of it could certainly be argued, and maybe it's almost diminimous [sic]—

THE COURT: At the time the question was asked, it was the first question, actually the second question of cross-examination, and that was a drug offense. Your first question was: You've been convicted of a felony. And the second was: And that was a drug offense.

MR. DANCE: That's correct.

THE COURT: So you hadn't put into issue the elements of knowledge and intent, I don't believe.

MR. DANCE: Well, I guess we just have a much different view of that. I think his direct testimony—I mean, his direct testimony, Your Honor—his whole defense is a lack of knowledge and intent. I mean, that's the whole basis of his direct testimony.

THE COURT: I beg your pardon. I think you're right about that. You hadn't started to explore those matters, but they had been gone into in substance and effect on the direct testimony.

No objection was made. I accept what Mr. O'Connell says as his reason for not making the objection, but the matter had been gone into in substance and effect, and I'm going to deny the motion for a mistrial.

. . . .

THE COURT: The basis of my view on this is that to begin with, I was trying to be very careful in simply referring to a felony. I don't know that referring to the felony and relating it as a drug felony would have been error to begin with, but it was my feeling that it ought not to be gone into unless knowledge, intention, and things of that nature had been developed.

You chose to put this defendant on the witness stand. You went into an abundance of things, certainly embracing his full background and knowledge of the area. I think under the circumstances, this defendant, as a witness, was subject to the same rules as any other witness.

I don't regard the matter as having been prejudicial in that respect, and I will—and I regard the question as not improper and the motion is denied.

Having set forth the background, we now proceed to consider Defendant's contention that the district court erred in failing to declare a mistrial following the Government's breach of the court's earlier *in limine* order not to refer to his former conviction as drug related. This claim of error is evidentiary, not constitutional. Both parties submit, and we agree, that this is a matter we review for abuse of discretion. *United States v. Jefferson*, 925 F.2d 1242, 1256 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 238, 239, 116 L.Ed.2d 194 (1991).

At the time the prosecutor asked Defendant if his prior felony conviction involved drugs, the district court's original order prohibiting the Government from asking this question was arguably still in effect. We believe the prosecutor's question may therefore have been inappropriate at the time he asked it. However, we note that when Defendant moved for a mistrial based on the prosecutor's question, the district court reconsidered its earlier ruling and decided the prosecutor's question was appropriate. In reconsidering its earlier decision, the district court apparently decided evidence of Defendant's prior felony drug conviction was now properly admissible under Fed.R.Evid. 609(a)(1). In the alternative, the court suggested the evidence could come in to show Defendant's knowledge and intention to operate a methamphetamine laboratory.[5]

---

**5.** The district court's mention of knowledge and intent is a reference to Fed.R.Evid. 404(b). Generally speaking, that rule provides evidence of other crimes, wrongs, or acts is not admissible to prove the criminal character of the person. *United States v. Cuch*, 842 F.2d 1173, 1175 (10th Cir.1988). However, evidence of other crimes, wrongs, or acts may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

Fed.R.Evid. 609(a)(1) allows evidence of prior felony convictions to be admitted, under certain circumstances, if "the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Assuming, without deciding, that the evidence of Defendant's prior drug conviction was prejudicial, and that its admission was an abuse of discretion, we hold Defendant has not demonstrated the existence of reversible error.

While we do not condone the prosecutor's possible mistake in asking the nature of Defendant's prior conviction before seeking a reversal, or at least a clarification of the district court's original ruling, neither do we agree with Defendant's suggestion that the district court likely changed its mind and decided to admit the evidence merely to avoid granting a mistrial. We will not assume the district court ruled for questionable reasons. The admission of Defendant's answer to the prosecutor's controversial question is the type of trial error subject to the harmless-error standard adopted in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In *Kotteakos*, the Court held that regarding nonconstitutional errors, the inquiry is "what effect the error had or reasonably may be taken to have had upon the jury's decision. . . . whether the error itself had substantial influence." *Id.* at 764–65, 66 S.Ct. at 1247–48. *See also United States v. Lane*, 474 U.S. 438, 472 n. 11, 106 S.Ct. 725, 744 n. 11, 88 L.Ed.2d 814 (1986) (Stevens, J., dissenting in part); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (*en banc*) (stating "[a] non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect" (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248)). We must therefore gauge whether the admission of information that Defendant's former conviction was drug related "substantially influenced" the jury's verdict in the context

of the entire case against him. *See United States v. Williams*, 923 F.2d 1397, 1401 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991).

The overwhelming evidence against Defendant included a considerable amount of lab equipment and chemicals for making methamphetamine, all found in Defendant's home. Moreover, a witness who was indicted in another related drug manufacturing case testified for the Government and against Defendant at trial. He said Defendant set up the methamphetamine lab with a friend and recounted an instance where Defendant brought a large bowl of methamphetamine out of the lab and gave some to the witness to try.

Examining the record, we think a jury could easily find Defendant guilty notwithstanding the reference to a prior drug related conviction. Defendant points to but a single reference in the entire case where this information regarding his prior felony conviction was elicited. He does not indicate where, if ever, the Government used this information. Moreover, defense counsel apparently did not request the court to strike the testimony or to give a limiting instruction. The information that Defendant's prior conviction was drug related would not have substantially influenced the jury's verdict in the context of the entire case against him. The nonconstitutional error alleged was harmless.[6]

## IV.

The remaining issues concern Defendant's sentence. The district court sentenced Defendant to 151 months imprisonment. Defendant contends the district court improperly calculated the sentence as governed by the federal sentencing guidelines (the Guidelines). He also contends the district court improperly applied a ten year mandatory sentence under the federal drug statute Defendant was convicted of violating. *See* 21 U.S.C. § 841(b)(1)(A). The Government, in its cross appeal, also

---

6. Because we resolve the admissibility of Defendant's prior felony drug conviction based on nonconstitutional harmless error analysis as applied to Fed.R.Evid. 609(a)(1), we need not con-

sider the Government's alternative suggestion that the evidence was admissible under Fed. R.Evid. 404(b). We express no opinion on that suggestion.

contends Defendant's mandatory sentence is improper. The Government, however, argues Defendant's mandatory minimum sentence should be twenty years because of his prior drug possession felony. We address Defendant's contentions first.

### A.

■ Defendant contends the district court's Guidelines sentence is wrong because the calculation used to determine the production capabilities of the methamphetamine laboratory was arrived at by hearsay testimony that is not part of the trial record. According to Defendant, "there was no testimony by any government witness specifically attempting to equate the equipment and chemicals found in Defendant's residence with an actual amount capable of being processed." He insists "[t]here was simply no proper testimony in this case upon which the quantity estimate could be based." We disagree.

The Guidelines provision called into question by Defendant's argument is § 2D1.4. The commentary to that provision provides:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, *and the size or capability of any laboratory involved.*

United States Sentencing Commission, *Guidelines Manual,* § 2D1.4, comment. (n. 2) (hereinafter U.S.S.G.) (emphasis added).

In its findings, the district court specifically referred to this section of the Guidelines. The court then noted a large flask was seized from Defendant's home and admitted into evidence at trial. The flask revealed the drug manufacturing capacity of the methamphetamine laboratory. According to the district court:

> The flask presented at trial and the other exhibits that have been referred to by [the prosecutor] Mr. Dance were

presented at trial. The Court directed Bonna Case, the probation officer, to prepare an Amended Presentence Report, which she did, so that the Court could make a ruling on Count One as to the effect that establishment of quantity would have to rest upon evidence that was presented at trial or which has a clear nexus to the evidence presented at trial.

> I rely upon the Probation Report and the findings of fact that are set forth therein, with the exception of that fingerprint item that was eliminated. I rely particularly upon paragraph 15 at page 9 that the drug quantity would translate to 3.5 to 4.9 kilograms of cocaine with a base offense level of 30.

> So as to the quantity, I find that based upon the size of capacity of the laboratory involved, the quantity, at least in one run, half the size, with that flask half full, would have been in that range as set forth in the Probation Report.

The Amended Presentence Report expressly relied on "an approximation of the size or capability of the laboratory involved" to arrive at Defendant's Guidelines offense level. To establish the approximate laboratory capacity, the report looked at the "22-liter flask and heating mantle seized and presently being held in evidence." The report then quoted a DEA chemist, who said it is "customary" that a flask—when it is being used—is only half-filled with liquid because a heating mantle heats only one-half of the flask. The report then noted the manufacturing capabilities revealed by this fact, and ultimately reduced some of the figures to arrive at what it felt was an appropriate manufacturing yield factor. The report determined the lab could manufacture 2.3 kilograms of methamphetamine at a time. This final figure placed Defendant in Guidelines offense level category 30. *See* U.S.S.G. § 2D1.1.

In an appeal from a sentence imposed under the sentencing guidelines, we give due deference to the district court's application of the sentencing guidelines to the facts. District court findings of fact are

accepted unless they are clearly erroneous. Questions of law are reviewed de novo. *United States v. Haar*, 931 F.2d 1368, 1377 (10th Cir.1991). *See* 18 U.S.C. § 3742(e).

This case is controlled by the analysis first announced in *United States v. Havens*, 910 F.2d 703 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991), and most recently followed by *United States v. Andersen*, 940 F.2d 593 (10th Cir.1991). These cases stand for the proposition that "the trial court, upon proper testimony, may estimate the ultimate quantity of produceable drugs." *Havens*, 910 F.2d at 705. In *Havens*, we found no denial of due process where "the district court's approximation of drugs that could be manufactured ... was based on record-supported expert testimony." *Id.* at 706.

In this case, Defendant attempts to make much of the fact that the district court relied on comments contained in the Amended Presentence Report to calculate the methamphetamine laboratory's production capacity. Defendant complains the Government did not produce the chemist in person so that defense counsel could cross-examine her at an evidentiary hearing. Defendant points to his continuing objections at three sentencing hearings following the guilty verdict.

We find no clear error in the district court's decision to base its calculations on the factual figures contained in the Amended Presentence Report. Although Defendant vehemently objected to the district court's use of this evidence, he offered no evidence of his own that could have called the Amended Presentence Report figures into doubt. When the Government declined to produce an expert witness for Defendant to cross-examine, he still could have attacked the figures by calling his own expert. This he failed to do.

As mentioned, we found no error in *Havens* when the trial court relied on figures derived from "record-supported expert testimony." 910 F.2d at 706. Likewise, in *Andersen*, we approved the district court's "determination of quantity ... based on the total set out in the presentence report." 940 F.2d at 597. We discerned no error in the district court's action in *Andersen* because the presentence report figures were supported by "expert trial testimony." *Id.* The figures in this case are also supported by expert testimony from the trial because, during the trial, a DEA expert identified the flask found in Defendant's home as a 22-liter, round-bottom cook flask that is used with a heating mantle and other equipment in an "ongoing continuous process of methamphetamine manufacture."[7] Because the Amended Presentence Report figures were supported by trial testimony, the district court's reliance on those figures was appropriate and is not a due process violation. *Havens*, 910 F.2d at 706. The district court correctly followed the Guidelines commentary and determined the size or capability of the methamphetamine laboratory to arrive at Defendant's Guidelines offense level. U.S.S.G. § 2D1.4, comment. (n. 2). *See United States v. Shewmaker*, 936 F.2d 1124, 1129 (10th Cir.1991) (under federal sentencing guidelines district court may consider any reliable source of infor-

---

**7.** The relevant testimony from the DEA expert concerning the flask states:

Q. I previously showed you a photograph of Exhibit Number 8.
A. Yes.
Q. This is what?
A. That's a 22-liter round-bottom flask, cook flask.
Q. And did you also see at the storage site, if you can step around here, Exhibit Number 28, previously identified as a heating mantle?
A. Yes. The round-bottom flask fits in the heating mantle, and then through a variable transformer, electricity is pushed into that heating mantle, converted into heat to boil what's inside the round bottom flask.
Q. Ms. Stevenson, based on your examination of the exhibits at the storage site on August the 22nd, and your analysis at that time as well as your analysis subsequently in the DEA laboratory and as well as your viewing of the other exhibits and photographs of items which I've shown you this afternoon, do you have a conclusion as to what all these various items were doing if they were found in close proximity to one another?
A. Yes. I believe all the items in this case are used in an ongoing continuous process of methamphetamine manufacture.

mation "which falls within constitutional standards," including hearsay, to arrive at a defendant's Guidelines sentence); *United States v. Easterling*, 921 F.2d 1073, 1077 (10th Cir.1990) ("[T]he use of estimates is an acceptable method of calculating drug quantities as long as the information upon which the estimates are based has a 'minimum indicia of reliability.'" (Citations omitted)), *cert. denied*, —— U.S. ——, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991).

### B.

█ Federal law requires mandatory minimum sentences for certain drug offenses. In this case, Defendant objects to the district court's application to him of the law which calls for a sentence of not "less than 10 years or more than life." 21 U.S.C. § 841(b)(1)(A). The district court found a mandatory minimum sentence of at least ten years was required. However, because the sentencing guidelines mandated an even longer sentence, the district court felt its finding was irrelevant to Defendant's sentence. We consider this issue because—as we will discuss—the Government contends the district court was also required to impose the recidivism enhancement of § 841(b)(1)(A), so that a twenty-year minimum sentence applies. But we turn to Defendant's argument first.

Defendant contends the mandatory minimum sentence does not apply because the district court relied on the Amended Presentence Report for its sentencing information. Defendant argues on appeal the evidence used to determine whether to impose a mandatory minimum sentence "must be decided at trial." "The government," according to Defendant, "is required to put on all of its evidence as to quantity so that the normal rules of evidence and constitutional safeguards can be utilized by a defendant in contesting that amount."

By making this argument, Defendant is again attacking the district court's use of the Amended Presentence Report to determine the seized methamphetamine lab's production size. We have already held the district court committed no error in relying on the Amended Presentence Report to de-

termine Defendant's sentence under the federal sentencing guidelines. We now hold there was no error in using the Amended Presentence Report to determine if Defendant was required to serve a mandatory minimum sentence under the federal drug control statute. *See* 21 U.S.C. § 841(b)(1)(A).

The pertinent penalty provisions of the federal drug control statute are unambiguous and mandatory:

(1)(A) In the case of a violation of subsection (a) of this section involving—

. . . .

(viii) 100 grams or more of methamphetamine . . .

such person *shall* be sentenced to a term of imprisonment which may not be less than 10 years or more than life. . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person *shall* be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment. . . .

21 U.S.C. § 841(b)(1)(A) (emphasis added).

The district court found Defendant was involved in the "attempt to manufacture and manufacture of methamphetamine" and found the amount of methamphetamine involved was "2.3 kilograms." This is well within the amount of methamphetamine necessary to make the statutory mandatory minimum sentence.

We see no meaningful distinction between the Guidelines and the drug control statute for purposes of district court findings concerning drug amounts for sentencing purposes.

The Due Process Clause does not restrict the court with respect to the type of information it may consider for purposes of sentencing. The defendant, of course, is entitled to notice of and an opportunity to respond to information to be considered by the sentencing court, in order that he may not be sentenced on the basis of misinformation.

*United States v. Copeland*, 902 F.2d 1046, 1050 (2d Cir.1990) (citations omitted).

Defendant here was given a copy of the Presentence Report and Amended Presentence Report. During three sentencing hearings that were called after objections and motions were filed, Defendant's counsel forcefully and ably argued for a favorable sentence for his client. Although he did not choose to do so, Defendant had the opportunity to call an expert witness of his own to dispute the figures contained in the Amended Presentence Report. The district court's finding is supported by the substantial evidence of the Amended Presentence Report prepared by a probation officer. *Easterling,* 921 F.2d at 1077 (district court does not err in accepting probation officer's drug quantity calculations which are based on information supported by minimum indicia of reliability). The district court properly held the minimum mandatory imprisonment provisions of the federal drug control law applies to Defendant.

Defendant's reliance on our decision in *United States v. Jenkins,* 866 F.2d 331 (10th Cir.1989), to support his argument that evidence must be produced at trial as to quantity of drugs before a statutory enhancement can be applied is misplaced. In *Jenkins,* we said a district judge—for purposes of deciding whether a mandatory minimum sentence is necessary—"is guided by the evidence introduced at trial." 866 F.2d at 334. In this case, the judge was properly guided by the evidence introduced at trial since he relied on the size of the methamphetamine cooking flask that was seized from Defendant's home and introduced at trial to determine how much methamphetamine Defendant could produce.

### C.

 The last issue we address is the Government's cross appeal. The Government contends Defendant's mandatory minimum sentence must be calculated under the recidivism enhancement provision of § 841(b)(1)(A) since he has a prior felony

drug offense. The relevant provision of the federal drug control statute provides a mandatory minimum sentence of not less than twenty years if the person commits a drug violation "after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(A). The questions we answer in considering the Government's cross appeal are whether Defendant has a prior felony drug conviction and, if he does, whether the prior felony drug conviction is "final."

There is no doubt Defendant was convicted of a drug felony before his conviction in this case. In June 1988, Defendant pleaded guilty in Utah state court to possession of cocaine, a third-degree felony under Utah law. However, the Utah law under which Defendant pleaded guilty provides a felony conviction is converted to a misdemeanor if a defendant successfully completes probation.[8]

Defendant was still on probation after he was arrested for the federal drug offense now before us. After his conviction on federal charges, his state probation was revoked. However, the district court found Defendant's prior Utah felony conviction was not "final" within the meaning of the federal drug control statute. According to the district court:

> This defendant had been under what is called 402 treatment in the state court pursuant to Utah Code Annotated 77[76]3 402 in which it was specifically provided that whenever a conviction for a felony, this would have been a 3rd degree felony in Utah, the conviction shall be deemed to be a misdemeanor if imposition of sentence is stayed and the defendant is placed on probation.
>
> That's what happened here, the defendant was on probation at the time of this offense. It was a misdemeanor and I hold that the minimum mandatory that is applicable to this case is ten years....

8. The Utah statute, in effect at the time of Defendant's Utah conviction, stated:

> (2) Whenever a conviction is for a felony, the conviction shall be deemed a misdemeanor if:
>
> . . . .

> (b) The imposition of the sentence is stayed and the defendant is placed on probation, whether committed to jail as a condition of probation or not, and he is thereafter discharged without violating his probation.

Utah Code Ann. § 76–3–402 (Repl.Vol.1990).

Whether a felony drug conviction is "final" under 21 U.S.C. § 841(b)(1)(B) is a question of federal law. *United States v. Morales,* 854 F.2d 65, 68 (5th Cir.1988). According to other courts interpreting this statute, a conviction is final when "the time for appeal has expired or a pending appeal has been disposed of." *United States v. Allen,* 566 F.2d 1193, 1195 (3d Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). *See also Morales,* 854 F.2d at 68–69 (citing cases and holding final conviction language of § 841 means "a conviction which is no longer subject to examination on direct appeal, including an application for certiorari to the United States Supreme Court, either because of disposition on appeal and conclusion of the appellate process, or because of the passage, without action, of the time for seeking appellate review"); *United States v. Rojas,* 724 F.Supp. 1339 (D.Kan.1989) (citing cases). We believe this is a generally sensible interpretation of the statute. We hold a sentence is final for purposes of § 841 when the conviction is no longer subject to examination on direct appeal, *Morales,* 854 F.2d at 69, or when reduction to a misdemeanor through the revocation of probation is no longer possible.

Defendant's Utah probation was revoked when he was convicted on federal drug charges. When his Utah probation was revoked, his Utah felony was no longer capable of being converted into a misdemeanor. Utah Code Ann. § 76-3-402 (Repl.Vol.1990). Defendant's Utah felony conviction was final since his time for appealing that conviction was expired.[9] Since Defendant has a prior felony conviction that is final, the recidivist language of § 841(b)(1)(A), which states that a person with a prior felony drug offense who is convicted of violating § 841 *"shall* be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment," applies. 21 U.S.C. § 841(b)(1)(A) (emphasis added). As we recently stated, "[s]hall is not a permissive word," *United States v. Johnson,* 941 F.2d

1102, 1112 (10th Cir.1991), and on remand the district court must apply the mandatory minimum sentence for prior drug felons as set forth in § 841(b)(1)(A).

In ordering this resentencing, we are keenly aware of the harsh result it puts on Defendant. His sentence will increase from approximately twelve and a half years to twenty years. However, the statute is clear and we are required to follow it. Mandatory minimum sentences are almost always harsh, but the binding authority we follow consistently holds that such sentences are not unconstitutional. *United States v. Brandon,* 847 F.2d 625, 631 (10th Cir.), *cert. denied,* 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988). *See Harmelin v. Michigan,* — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (mandatory sentence of life in prison without possibility of parole for possessing more than 650 grams of cocaine is not cruel and unusual punishment). Moreover, the fact that some co-defendants in this case may receive lighter sentences does not alter the unfortunate outcome. Defendant's mandatory minimum sentence is required because he is a repeat offender, and—given this background—Defendant cannot challenge his sentence based on lighter sentences that may be given to any co-defendants. *United States v. Garcia,* 693 F.2d 412, 417 (5th Cir.1982).

### V.

For the foregoing reasons, the judgment of conviction against Defendant Short is AFFIRMED. However, because there was an error in sentencing, the matter is REMANDED to the district court with instructions to vacate Defendant's sentence and then immediately resentence him in accordance with the views expressed in this opinion.

Judgment of conviction AFFIRMED; REMANDED for resentencing.

---

9. The Utah Rules of Criminal Procedure provide that "[a]ll appeals in criminal cases shall be taken within 30 days after the entry of the judgment appealed from." Utah R.Crim.P. 26(4)(a).