**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 31 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREGORY LACY,

Defendant - Appellant.

No. 00-2096

(District of New Mexico)

(D.C. No. CR-99-439-BB)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON** and **LUCERO**, Circuit Judges, and **MILLS**, District Judge.[**]

## I. BACKGROUND

Officers John Salazar, Robert D. Sanchez and Michael Teague were all part of a

Drug Enforcement Agency (DEA) interdiction team in Albuquerque, NM. As part of

their duties, the team routinely went to the Albuquerque train station to meet the

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

eastbound Amtrak train when it stopped on its Los Angeles to Chicago route. Prior to the train's arrival, officers would review passengers' reservations by checking Amtrak's computer records. They were on the look out for reservations that fit drug trafficking profiles (*i.e.* reservations made soon before the time and date of departure, for one way tickets that were paid for in cash).

On March 23, 1999, Officer Teague reviewed the reservation record of Amtrak passengers Millard and Gregory Lacy. Greg and Millard were traveling together, sharing a room in the train's sleeping car, and bought their tickets with cash. The Lacys originally reserved tickets for March 22, but they missed that train and had to take the March 23 train instead. On their way to meet the Lacys' train, Officers Teague, Sanchez, and Salazar made several calls to the number the Lacys provided to Amtrak. Each time, the officers received a message stating that the phone had been disconnected.

When the officers reached the station, Officer Salazar spoke with the Amtrak attendant assigned to the sleeper car occupied by the Lacys. The attendant described the Lacys, said they were staying in two rooms in the same car, and then pointed them out to Officer Salazar. Officer Salazar was several feet away from the Lacys at the time. He observed them for some time and watched as they used the public telephones. When he walked toward them, Millard walked away so as to board the train. Officer Salazar approached him and turned on a tape recorder he carried on his belt. Officer Salazar was in street clothes and did not have a weapon visible. He identified himself as a police

2

officer and asked Millard if he could speak to him. Millard said that he could. Officer Salazar asked Millard if he had any luggage and Millard said that he had a bag and a radio in his room. Officer Salazar asked Millard if he was traveling with anybody else and Millard said that he was traveling with his brother Greg. Officer Salazar told Millard about his duties as an interdiction officer. He said that it was his job to talk with passengers because "we have problems with people carrying contraband, . . . narcotics, weapons, guns, all kinds of stuff." Salazar then asked if he could search the room and Millard said "Yes."

Meanwhile, Gregory Lacy began to approach the room. As he did so, Officer Sanchez arrived. Officer Sanchez stopped Gregory and asked him for identification. Gregory claims that he identified himself as Gregory Lacy. However, he produced a college identification card bearing the name of his younger brother, Michael Lacy. Officer Sanchez knew that the train reservation had been made in the names of Gregory and Millard Lacy. He asked Gregory if his name was Gregory or Michael—the name that appeared on the card. Gregory said his name was Michael, and that Gregory was the name of his younger brother, in whose place he had come. From that point on, Officer Sanchez addressed Gregory as Michael and Gregory assumed that identity. Officer Sanchez asked for and received Gregory's permission to search the room and luggage. Officer Sanchez's entire encounter with Gregory lasted about seven minutes. It revealed nothing. When the encounter ended, Officer Sanchez released Gregory and went to

3

Millard's room to assist Officer Salazar.

Gregory followed Officer Sanchez to Millard's room. As the two men stood in the hallway outside the room, Officer Salazar asked Millard if the person standing with Officer Sanchez was his brother Greg. Millard said that it was not, that Greg was one of his brothers, but the person in the hallway was Michael Lacy, another one of his brothers. Officer Salazar then proceeded to search Millard's black duffle bag. Although Officer Salazar found no contraband, he found Millard to be "very nervous" during the search—shuffling back and forth, continually touching his head and avoiding eye contact with Officer Salazar. Officer Salazar noticed an old, "beat up" radio on the lower bunk bed and Millard became more nervous when Officer Salazar handled it. Millard's shuffling intensified, he fidgeted, looked side to side quickly, and touched his face.

Officer Salazar decided to examine the radio more closely. When he did so, he saw tool marks around the screws on the back of the stereo and scratches around the screws. Based on his training, Officer Salazar determined that the back "had been taken on and off quite a bit." He said to Millard "Have you ever opened this before? . . . This thing has been opened; take a look at it." He then asked, "Who's [sic] is this, is this yours?" Lacy responded, "I bought it from a friend," but he soon changed his answer and said he merely borrowed it.

Officer Salazar tapped one of the stereo's speakers and heard a "clanking noise like something hitting the side on the inside of the speaker box" when he shook the speaker.

4

He picked up the other speaker and could feel a difference between the two speakers. Officer Salazar peered into a gap in the back of the speaker and saw some grey material. He inserted a leatherman tool through the gap and tried to pull the material from the speaker. Something was wrapped inside the material which prevented him from removing it from the speaker. He poked his finger through the gap in the speaker and felt a "lumpy substance" wrapped in a grey cloth. He placed his nose near the gap and detected the odor of ether. Officer Salazar knew from his training and experience as an interdiction officer that the smell of ether indicated the presence of cocaine base.

By the time Officer Salazar discovered the substance in the speaker, Officer Teague had arrived on the scene. He and Officer Sanchez were standing in the hallway with Gregory Lacy while Officer Salazar spoke to Millard about the stereo. Officer Salazar then said, "There's something wrong with this. I don't feel comfortable, I don't feel comfortable with this." Officer Salazar told Millard, "[T]here's something in there like a ball or something inside where it won't come out. And I should have to break it, I should have to break it. You want to figure out what it is [?] Go ahead and break it open [?]" Millard replied, "Well, I don't want no one to mess up the radio, you know I want to listen to it." Officer Salazar acknowledged Millard's concern.

Gregory had by this time shown a keen interest in the stereo's examination and when Millard expressed concern, Gregory chimed in "Right" as if to echo Millard's concern that the radio remain operational. Officer Sanchez responded, "[Y]ou have one

5

speaker there I'd say just go ahead . . . break it open." Officers Salazar and Sanchez then looked at Millard and Millard nodded to them. The officers immediately began to pry the speaker apart. Officer Salazar used a pair of pliers to break off part of the back of the speaker and extract a grey cloth which turned out to be a pair of boxer shorts. Two packages of crack cocaine were wrapped inside the boxer shorts. Extracting the boxer shorts and cocaine did not affect the stereo's ability to function. Moreover, the entire series of events—from initial contact to discovery of the drugs—lasted fifteen minutes.

The agents arrested Millard and Gregory Lacy and took them into custody. Officer Sanchez conducted a strip search of Gregory Lacy at the DEA offices. As a routine part of the search, Officer Sanchez ordered Gregory to turn away from him and bend over. When Gregory did this, Officer Sanchez discovered that Gregory had a package wedged between his buttocks. The package consisted of 34 packets which contained 24 grams of crack. Gregory was processed and signed a fingerprint card and several other documents as "Michael B. Lacy."

Prior to trial, Gregory and Millard Lacy each moved to have the crack suppressed. They claimed that the officers lacked probable cause to arrest them and that the officers' search exceeded the scope of their consent. United States District Judge Bruce Black presided at a joint hearing on the Lacys' motions. Upon hearing the evidence, Judge Black found that while the dialogue of Millard's encounter was equivocal, Millard consented to Officer Salazar breaking open the speaker. Millard's sole condition with

6

respect to Officer's Salazar's search was that Officer Salazar leave the stereo operational. Judge Black also found that there was probable cause to arrest Gregory since he traveled from a city that was a source for drugs, shared a room with someone engaged in drug trafficking, purchased a one-way ticket in cash, and attempted to conceal his identity.

Following Judge Black's ruling, Gregory and Millard Lacy proceeded to trial. The trial was by jury and Judge Warren Egington[1] presided. The government played its tape of Officer Salazar and Millard Lacy's conversation on the train. While the tape played, the prosecution used a monitor to display a typed transcript of the tape which Officer Salazar prepared. There were two ways in which the transcript differed from the one the trial court used at the suppression hearing. First, although the court had already determined during the motion to suppress that Millard had said, "Well, I don't want no one to mess up the radio, you know I want to listen to it.", the transcript displayed on the monitor read, "Well, I wanna one to mess up the radio, you know I want to listen to it." Second, the transcript that appeared on the monitor stated that Millard went to get a drink of water during the search of his compartment and luggage. The transcript presented at the motion to suppress indicated no such thing. Gregory Lacy moved for a mistrial, arguing that Officer Salazar changed the transcript in order to bolster his credibility. Judge Egington took the matter under advisement and ruled that Judge Black should

---

[1]  The Honorable Warren W. Egington, Senior United States District Judge for the District of Connecticut, sat by designation at Gregory Lacy's trial.

decide the merits of the motion. Judge Black never ruled on the motion. Thus, the district court deemed it to be denied.

After closing arguments, the court gave the jury instructions. The court did not, however, inform the jury that the weight of the cocaine base was an element of a 21 U.S.C. § 841 offense. Nevertheless, the jury convicted Millard and Gregory. At sentencing, the court found that the preponderance of the evidence showed that Gregory and Millard Lacy were responsible not only for the cocaine found on each of them individually, but for the cocaine possessed by the other as well. Thus, the court found each brother responsible for possessing 68.6 grams of cocaine. Pursuant to the United States Sentencing Guidelines, the court sentenced Gregory Lacy to 240 months in prison.

Gregory filed a timely appeal on March 15, 2000. He argues that the district court erred when it denied his motion to suppress and erred again when it found there was probable cause to support arrest. He also argues that the district court erred when it found that the prosecutor's display of altered transcripts to the jury did not constitute grounds for a mistrial. Finally, he contends that the trial court erred at sentencing when it found him responsible for possessing 68.8 grams of cocaine base.

The Court exercises jurisdiction based on 28 U.S.C. § 1291. We affirm all the district court's judgments.

## II. ANALYSIS

### *The Motion to Suppress*

The Court reviews the denial of a motion to suppress in the light most favorable to the party who prevailed below. See United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998). The Court must accept the trial court's factual findings unless they are clearly erroneous. See United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir.), cert. denied, 525 U.S. 978 (1998). Whether or not law enforcement had probable cause to arrest a defendant is a legal issue subject to *de novo* review. See United States v. Springfield, 196 F.3d 1180, 1182 (10th Cir. 1999), cert. denied, 529 U.S. 1029, 120 S.Ct. 1444, 146 L.Ed.2d 331 (2000).

Gregory alleges that the police arrested him merely because his brother Millard was found with drugs and the two of them were traveling together. He argues that proximity to drugs and association with criminals do not establish probable cause and that the trial court should have suppressed the drugs that Officers Salazar and Sanchez found.

In ruling on Gregory's motion to suppress, the trial court applied the "totality of the circumstances" test enunciated in Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In doing so, the trial court correctly stated that Gregory and Millard's association, by itself, was not sufficient to establish probable cause. See, i.e., Vazquez-Pulido, 155 F.3d at 1216-17 (citing United States v. Hillison, 733 F.2d 692 (9th Cir. 1984)("In order to find probable cause based on association with persons

9

engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in a criminal enterprise must be shown.")). Thus, the trial court looked to other factors in order to make a probable cause determination. It considered the fact that Gregory paid cash for a one-way ticket from a city that was a drug source and shared a room with Millard. It also relied on Gregory's conduct on the train. In particular, it noted his deliberate presence in the doorway during Officer Salazar's search of Millard's train compartment and the "keen interest" he showed in the stereo as Officer Salazar searched it for drugs. These facts are enough to establish probable cause under Gates.

In making its determination that probable cause existed to arrest Gregory, the trial court emphasized Gregory's attempt to conceal his identity from police. Probable cause, however, must exist "at the moment the arrest was made"; it cannot be established by evidence made known to the police after the arrest is made. See Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)(citations omitted). Here, Gregory was booked as Michael Lacy and made his initial appearance under that name. Since the police were not aware that he concealed his identity at the time they arrested him, this factor cannot be used to establish probable cause. See Id. However, the totality of circumstances clearly show that the officers had probable cause to arrest Gregory.

### Denial of the Motion for New Trial

The Court reviews a trial court's denial of a motion for a new trial for abuse of

10

discretion.  See United States v. Garcia, 182 F.3d 1165, 1169 (10th Cir. 1999).  A trial court must grant a new trial only if the weight of the evidence produced at trial "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  See United States v. Washington, 184 F.3d 653, 657 (10th Cir. 1999) (citation omitted).

Gregory does not make any argument to support a motion for a new trial other than the arguments he raised on his motion to suppress.  He merely reasserts that his arrest was unlawful because it was based exclusively on his association with his brother Millard.  As the Court has explained, Gregory and Millard's association was merely one factor in the "totality of circumstances" that supported Gregory's arrest.  See Gates, 462 U.S. at 238.  It was Gregory's association with Millard, his cash purchase of a one-way ticket from a city that was a drug source, his sharing of a room with Millard, his deliberate presence at Millard's room during the search, and his "keen interest" in Officer Salazar's examination of Millard's stereo that established probable cause to arrest Gregory.  Given the presence of these factors, the police had probable cause to arrest Gregory.  See Id. at 238.  As such, the trial court properly denied

***Sentencing for Possession of Cocaine Base***

The United States Sentencing Guidelines allow district courts to consider as relevant conduct any drug amounts which were part of the same course of conduct or common scheme or plan as the offense of conviction, whether or not the defendant was

11

convicted of offenses connected to the additional drug amounts. See U.S.S.G. § 1B1.3; United States v. Roederer, 11 F.3d 973, 978-79 (10th Cir. 1993). The government must, by a preponderance of the evidence, establish the additional amounts of drugs to be considered at sentencing. See United States v. Rios, 22 F.3d 1024, 1027 (10th Cir. 1994). The evidence relied on by the sentencing court must be supported by "some indicia of reliability." See United States v. Short, 947 F.2d 1445, 1456 (10th Cir. 1991).

Gregory does not dispute that the police discovered 24 grams of crack on him and 44.6 grams on his brother Millard totaling 68.6 grams. Rather, he argues that he should not be accountable for the 44.6 grams of crack found in Millard's radio because the government failed to show that he exercised any actual or constructive control over those drugs. He also contends that the differences in the purity, color, and packaging of his crack from Millard's shows that the drugs were not part of the same conduct or scheme.

The district court rejected these arguments at sentencing. The court found that the facts of the case demonstrated that Gregory and Millard were involved in a common scheme to possess and distribute cocaine base. The evidence which supported this finding included the brothers buying tickets together, traveling together and sharing a room. Moreover, Gregory made it a point to be present when Officer Salazar searched Millard's radio, all the while demonstrating what the district court called a "keen interest" in the radio. Gregory attempted to conceal his identity and Millard averred to Gregory's attempted misidentification immediately before Officer Salazar discovered the 44.6 grams

12

of crack hidden in Millard's radio. The timing of these events and the actions themselves demonstrate that Gregory was conscious of guilt and knew that drugs were hidden in Millard's radio. Given these facts, the trial court had ample evidence to find that the 68.6 grams of crack involved here were part of a common scheme. See U.S.S.G. § 1B1.3; United States v. Roederer, 11 F.3d 973, 978-79 (10th Cir. 1993). Accordingly, the preponderance of the evidence supports the district court's decision to sentence Gregory Lacy for the drugs found on him and the drugs hidden in Millard's radio.

### *Mistrial Based on Presentation of Altered Transcripts*

The Court employs an abuse of discretion standard when reviewing a trial court's refusal to grant a mistrial or new trial based on prosecutorial misconduct. See United States v. Galbaldon, 91 F.3d 91, 93-94 (10th Cir. 1996). To prevail on a motion for new trial based on prosecutorial misconduct, the appellant must show that the prosecution's acts were "flagrant enough to influence the jury on grounds other than the evidence presented." See United States v. Lowder, 5 F.3d 467, 473 (10th Cir. 1993).

Gregory alleges two instances of prosecutorial misconduct arising from items presented to the jury on the courtroom's video monitors. First, although the district court had already determined during the motion to suppress that Millard had said, "Well, I don't want no one to mess up the radio, you know I want to listen to it.", the transcript displayed on the monitor read, "Well, I wanna one to mess up the radio, you know I want to listen to it." Second, the transcript the government displayed to the jury stated that

13

Millard went to get a drink of water during the search of his compartment and luggage when Officer Salazar's report did not indicate that Millard did this.

The only prejudice Gregory claims is that Officer Salazar may have bolstered his testimony by changing the transcripts. Gregory does not explain how these items bolstered Officer Salazar's credibility and it is not plain on the face of his argument how they could do so. The transcripts appeared on the monitor very briefly and it is uncertain whether the jury ever got to see them since a technical difficulty disrupted the monitor's display. In any case, the prosecution submitted a correct copy of the transcript for the jury to examine and the court told the jury that the transcripts were merely for their use to help determine what the audio tapes actually said. Thus, determinations about the tapes' content were left to a jury which as likely as not discredited Officer Salazar's testimony due to the aforementioned inconsistencies. In any case, the evidence overwhelmingly supports Gregory's conviction. His trial may not have been error-free, but it was undoubtedly fair. A fair trial is all that Gregory Lacy was entitled to and he received one. See U.S. v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d. (1983)(stating that "there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial"). Thus, the district court properly denied Gregory Lacy's motion for a mistrial since the errors he complains of were harmless.

14

## III. CONCLUSION

For the reasons stated above, we AFFIRM Gregory Lacy's conviction and the sentence that the district court imposed.

Entered for the Court


Richard Mills
United States District Judge